## In re GUARDIANSHIP OF STEIN.

[Cite as *In re Guardianship of Stein,* 157 Ohio App.3d 417, 2004-Ohio-2948.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22092.

Decided June 9, 2004.

Edward P. Markovich, for appellants Matthew Stein and Arica Heimlich.

Linda Kersker, Clair E. Dickinson and Jay Krasovec, for appellee/limited guardian Ellen Kaforey.

David Kitzler, for appellee Emergency Custodian Richland County Children's Services.

Dale Musilli, for the child.

---

BATCHELDER, Judge.

{¶ 1} Appellants, Matthew Stein and Arica Heimlich, appeal from a judgment of the Summit County Court of Common Pleas, Probate Division, that granted the application of Ellen Kaforey to be appointed limited guardian of their infant child for purposes of making medical decisions including the withdrawal of life support. We affirm.

## I

{¶ 2} On March 15, 2004, five-month-old Aiden Stein was transported from a hospital in Richland County to Akron Children's Hospital. Aiden arrived at Akron Children's Hospital in critical condition. Due to an apparent trauma that caused inadequate blood flow and oxygen to his brain, Aiden had sustained massive brain damage and has been in a coma since his admission to the hospital. Aiden continues to have brain-stem activity but his cortex, the part of the brain that makes us who we are, was destroyed. Doctors at Akron Children's Hospital, as well as the trial court's independent medical expert, agree that the child sustained permanent, severe brain damage and that he will be in a persistent

vegetative state, meaning that he will always be unaware of his own environment and be unable to interact with it.

{¶ 3} According to Aiden's mother Arica, Aiden was fine when she fed him that morning. Arica left for work shortly after feeding him and was not home when Aiden began to experience distress. Aiden was home alone with his father Matthew that morning. According to Matthew, he gave Aiden a bottle, left the room a couple of times and, while he was out of the room, Aiden experienced difficulty breathing and lost consciousness. Matthew sought help from neighbors who attempted CPR and called 911.

{¶ 4} Following an examination and medical history as provided by the parents, doctors at Akron Children's Hospital, as well as the trial court's independent medical expert, agreed that Matthew's explanation of what had happened that morning did not adequately explain Aiden's massive brain injury. CT scans showed that Aiden had blood around his brain, retinal hemorrhages, and, because there was no medical history given by the parents of a significant trauma event immediately preceding the injury, doctors diagnosed Aiden's condition as being consistent with a nonaccidental head trauma, which is commonly referred to as shaken baby syndrome.

{¶ 5} The CT scans further demonstrated that Aiden had sustained at least one prior brain injury, causing subdural bleeding, but that the prior injury or injuries had been less severe. It was the agreed opinion of the treating physicians that the prior injury was unrelated to the life-threatening injury that Aiden sustained on March 15, except that the prior damage could demonstrate a prior incident or incidents of shaking.

{¶ 6} Because there was virtually no hope that Aiden would ever recover from the persistent vegetative state, the ethics committee at Akron Children's Hospital recommended that Aiden be removed from life support and that he be provided with comfort care. The ethics committee further agreed that, because Aiden's parents were believed to be involved in Aiden's injuries, an independent guardian should be appointed to make the decision of whether Aiden should be removed from life support.

{¶ 7} The application for guardianship was filed in the Summit County Court of Common Pleas, Probate Division. A hearing commenced on the application on April 12, 2004. After a four-day hearing, the trial court granted the application. The parents appeal and raise two assignments of error.

## II

### Assignment of Error I

"The probate court erred in applying R.C. 2133.08 to a minor without a prior termination of parental rights in medical decision-making."

{¶ 8} Through their first assignment of error, the parents argue that the trial court erred in proceeding on the application for guardianship because their parental rights had not yet been fully adjudicated in the juvenile court. Without such a prior adjudication, they contend, they were deprived of their constitutional right to due process of law. We will not reach the merits of this assigned error because it has not been preserved for appellate review.[1] It is possible, although not raised as error, that R.C. 2111.06 be read as ambiguous as to whether it authorizes the appointment of a guardian to make the decision of whether a minor child should be removed from life-sustaining medical treatment. Only activist judges would take the view that they should suddenly create an ambiguity where none exists. The Probate Court of Summit County has operated for more than a decade under the understanding that R.C. 2111.06 authorized its decision in this case, see *In re Guardianship of Myers* (1993), 62 Ohio Misc.2d 763, 610 N.E.2d 663, and its authority in this regard has not been challenged in the courts, nor has amendment been sought by the Ohio General Assembly. The clear unrebutted presumption to be concluded from this state of the law is that R.C. 2111.06 has been construed by the court and unamended by the General Assembly and therefore the probate court had the authority it exercised in this case.

{¶ 9} "It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. "Constitutional rights may be lost as finally as any others by a failure to assert them at the proper time." Id. at 62, 43 O.O.2d 119, 236 N.E.2d 545.

{¶ 10} The parents assert that the guardianship application should not have gone forward until the juvenile court in Richland County had fully adjudicated their parental rights. To timely assert such a challenge, at a minimum, the parents should have raised an affirmative objection prior to, or at least at the commencement of, these proceedings. Instead, the parents participated in the hearing on the guardianship application for a period of four days.

{¶ 11} Moreover, the parents consented to the appointment of the guardian for limited medical purposes. During the second day of the hearing, the parties stipulated that the guardian would be appointed to make medical decisions for

---

1. In addition to this issue that was not preserved for review, this case involves other significant issues that have not even been raised on appeal. Several critical issues involved in removing life support from a minor child have not been addressed by the Ohio General Assembly or the Ohio Supreme Court. Because these issues are not properly before us, however, we do not reach them today.

Aiden, excluding the withdrawal of life support. The parents entered into this stipulation despite the fact that there was an existing juvenile court order from Richland County that "[a]ll decisions regarding medical care for Aiden Hemlich, minor child, shall be made jointly by Richland County Children Services Board and the child's parents, upon the advice of the child's physicians."

{¶ 12} The parents raised the issue of their constitutional rights for the first time during their closing argument at the conclusion of a four-day hearing, when it was clearly too late for the trial court to correct the alleged error. At that time, counsel for the parents stated, "I would ask that the Court deny the application until such time as all parental rights could be terminated, if that is the ultimate outcome, and that the application could be refiled at that time."

{¶ 13} Because the parents failed to timely raise this alleged error in the trial court, we will not reach the merits of their constitutional challenge. The first assignment of error is overruled.

### Assignment of Error II

"The probate court erred in determining under R.C. 2111.06 that Aiden Stein's best interest would be promoted by his death."

{¶ 14} Although this assigned error purports to challenge the trial court's determination of what was in Aiden Stein's best interest, the parents make no argument to that effect. App.R. 12(A) provides that errors not separately argued by brief may be disregarded. Because the parents make no argument and this court is not inclined to develop an argument for them, we will not reach the alleged error as stated. In the interests of fairness, however, we will address the argument that the parents have set forth under this assigned error. See *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App.3d 342, 344, 16 OBR 391, 476 N.E.2d 388.

{¶ 15} The argument that the parents do assert here challenges the trial court's factual finding that the massive brain injury that Aiden sustained on March 15, 2004, was the result of shaken baby syndrome. In support of their argument, the parents point to an article published in a medical journal about the controversy surrounding the diagnosis of shaken baby syndrome. This evidence was not before the trial court and cannot be considered by this court on appeal. See *Ferraro v. B.F. Goodrich Co.* (2002), 149 Ohio App.3d 301, 314, 777 N.E.2d 282, fn. 5. The parents did present evidence through their medical expert, however, that contradicted the opinions of the other medical experts that Aiden's current brain injury resulted from shaken baby syndrome and that evidence can be considered on appeal.

{¶ 16} The parents essentially contend that the trial court's factual finding that Aiden's injuries were the result of shaken baby syndrome was against the weight of the evidence presented to the trial court. When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. *In re Ozmun* (Apr. 14, 1999), 9th Dist. No. 18983, 1999 WL 225847. In determining whether a criminal conviction is against the manifest weight of the evidence:

" 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 17} Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.

{¶ 18} Although the trial court had evidence before it, through the parents' expert witness, that, rather than shaken baby syndrome, Aiden's injuries could have resulted from a cumulative effect of subdural hematomas caused by a prior injury or injuries, there was testimony from three other medical experts that Aiden's current massive brain injury must have been caused by a major trauma to Aiden's brain that morning. Although every one of these experts agreed that Aiden had sustained a prior, less severe, trauma to his brain that had caused some bleeding, each of them opined that Aiden's current injury could not have been caused by a buildup of the prior bleeding. These experts explained that the prior bleeding was merely evidence of a prior, unrelated injury and that the new bleeding around Aiden's brain must have been caused by a severe trauma to Aiden's brain the morning of March 15. Moreover, had Aiden been injured prior to that morning, he would have been unresponsive earlier, rather than acting normally when his mother fed him before she left for work.

{¶ 19} The trial judge, acting as factfinder, explicitly stated that he found the expert testimony of the independent medical expert and the guardian applicant's experts to be more persuasive than that of the parents' expert. It is primarily for the trier of fact to determine the credibility of witnesses and the weight to be

given their testimony. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 20} The trial court did not lose its way in finding that Aiden Stein's injuries were the result of shaken baby syndrome. The second assignment of error is overruled.

## III

{¶ 21} The assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Probate Division, is affirmed.

Judgment affirmed.

CARR, P.J., concurs in judgment only.

SLABY, J., concurs in judgment only.

CARR, Presiding Judge, concurring in judgment only.

{¶ 22} I concur in the judgment of the court today but write separately to emphasize the many critical issues that have been left unresolved by today's decision.

{¶ 23} Tragedy does not even begin to describe what has happened to six-month-old Aiden Stein. Aiden is not brain dead so, according to the definition of death under Ohio law, he is still alive. See R.C. 2108.30. Although not legally dead, Aiden is trapped somewhere between life and death with no ability to remove himself from that state. The cortex of his brain is permanently and severely damaged, and he has lost all cognitive functioning. Only his brain stem, which controls primitive activities such as breathing, heart rate, and reflexive actions, remains functional. All of his treating physicians agree that, for the rest of his life, Aiden will remain in a persistent vegetative state, unable to interact with or even perceive his environment. The United States Supreme Court more thoroughly described a persistent vegetative state as follows:

"Vegetative state describes a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heart beat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner." *Cruzan v. Dir., Missouri Dept. of Health* (1990), 497 U.S. 261, 267, 110 S.Ct. 2841, 111 L.Ed.2d 224.

{¶ 24} Due to advances in medical technology, a patient can exist in a persistent vegetative state for many years, unable to fully live but also unable to die.

"Debate over a patient's right to refuse life sustaining medical treatment has been fueled by advances in medical technology which have enabled medical practitioners to prolong life where, in the past, death would have been shortly forthcoming. A semblance of life may now be sustained long after conscious existence has ceased. 'Hopelessly or terminally ill patients who in the past would have met with a swift end, now find that medical science can sustain them, near the threshold of death, but not yet across it.'

"* * *

" 'Not long ago the realms of life and death were delineated by a bright line. Now this line is blurred by wondrous advances in medical technology—advances that until recent years were only ideas conceivable by such science-fiction visionaries as Jules Verne and H.G. Wells. Medical technology has effectively created a twilight zone of suspended animation where death commences while life, in some form, continues.' " *In re Fiori* (1995), 438 Pa.Super. 610, 632–633, 652 A.2d 1350, quoting *Rasmussen by Mitchell v. Fleming* (1987), 154 Ariz. 207, 741 P.2d 674, 678.

{¶ 25} Unfortunately, the law has not kept pace with the advances in medicine that allow life to be prolonged beyond its natural limits. In 1989 and 1991, the Ohio General Assembly enacted its modified version of the Uniform Rights of the Terminally Ill Act. See R.C. 2133.0 through 2133.15. R.C. 2133.08 is the only Ohio statute that explicitly authorizes the removal of life-sustaining treatment. No one is asserting that R.C. 2133.08 applies here because, by its very terms, R.C. 2133.08 applies only to adults and Aiden is not an adult. See R.C. 2133.08(A)(1).

{¶ 26} The probate court has taken the view, however, that because R.C. 2133.08 is inapplicable, its authority is derived from R.C. 2111.06, a general statute that authorizes the probate court to appoint a guardian to make medical decisions for a minor. See *In re Guardianship of Myers* (1993), 62 Ohio Misc.2d 763, 610 N.E.2d 663. Although the probate court's authority in this regard has not been challenged today, nor was it challenged in the *Myers* case, the lack of a challenge does not equate with a grant of authority by the legislature.

{¶ 27} For several reasons, it is questionable whether the legislature intended R.C. 2111.06 to authorize the probate court to appoint guardians to make decisions about the removal of life-sustaining treatment from a minor ward. To begin with, R.C. 2111.06 predates R.C. 2133.08 and the Uniform Act by decades and has not been amended since 1977. One could take a view contrary to that of the probate court that, by failing to make any provisions for minors in R.C. 2133.08, the legislature did not intend that these types of decisions would be made at all in the case of a minor or that the decision would be made by the minor's parents.

{¶ 28} Next, although no one disputes that R.C. 2111.06 and R.C. 2111.13 authorize the appointment of a guardian to make medical decisions, those decisions have typically involved maintaining the health and well-being of the ward, not deciding when a child's life may end. All of the parties to this action seem to agree that a guardian's authority to make medical decisions encompasses the decision to remove life-sustaining treatment, despite the lack of any such language in the guardianship statutes. I am troubled by their focus on the lack of statutory language prohibiting the guardian from making this type of decision, particularly given that the guardianship statutes expressly grant certain types of authority. If the legislature had intended "medical * * * treatment" to encompass the removal of life-sustaining treatment, it certainly could have made that clear when it codified the Uniform Act.

{¶ 29} Finally, if the legislature intended R.C. 2111.06 to authorize the appointment of a guardian to make life and death decisions, it likely would have included specific standards to guide the decision-making process. Where the legislature did explicitly authorize the power to make decisions regarding the removal of life-sustaining treatment, it did not do so with merely a blanket requirement that the decision be made in the patient's best interest. R.C. 2133.08 authorizes the removal of life-sustaining treatment only after a long list of requirements has been met. Among those requirements is that the individual on life-sustaining treatment be either terminally ill or has been in a permanently unconscious state for at least 12 months. R.C. 2133.08 also includes detailed requirements for determining who will make the decision, what must be considered in making the decision, and how the decision can be challenged in the probate court.

{¶ 30} In addition to the question of the probate court's authority in this area, I am concerned that in another situation, aside from the facts of this case, the constitutional rights of the parents to make this decision may not be adequately protected. I agree that the parents here did not preserve this issue for appellate review and that we should not address the merits of the challenge. Nonetheless, it is the position of the guardian that R.C. 2111.06 authorizes the probate court to appoint a guardian to make this critical decision whenever the probate court determines that the minor has no parents, the parents are unsuitable, or if the minor's interest "will be promoted thereby." Given that such a decision essentially terminates parental rights, I question whether parental rights are adequately protected under such a statutory scheme or whether in fact the legislature even contemplated the use of the statute in this manner.

{¶ 31} It is time for the Ohio General Assembly to enact comprehensive standards to adequately protect the competing interests at issue here and to guide the decision-making process in such a critical area. In the meantime, "[i]t may be advantageous for the Court to proceed slowly, on a case by case basis,

while awaiting action by the state legislature." *In re Fiori* (1995), 438 Pa.Super. 610, at 655, 652 A.2d 1350 (Popovich, J., concurring and dissenting).

SLABY, Judge, concurs in judgment only.

{¶ 32} I concur in judgment only. I feel it necessary to emphasize that this court reviews only legal issues properly raised and preserved in the trial court. See *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 210, 24 O.O.3d 316, 436 N.E.2d 1001. We have the responsibility to interpret the law as it exists and not as to what we think it should be. I agree with Judge Batchelder that the unchallenged law in this district was set forth by Judge William Spicer in *In re Guardianship of Myers* (1993), 62 Ohio Misc.2d 763, 610 N.E.2d 663. I believe that is the extremely narrow issue that was attempted to be raised at this later date.

{¶ 33} The parents make a compassionate plea that we reach a constitutional issue that was neither properly raised nor preserved in the trial court. Our review cannot create arguments for the parents. Consequently, I would concur in Judge Batchelder's opinion except that I would not have gone so far as to develop an argument for the parents under the second assigned error. Although Judge Batchelder, in fairness, took it upon himself to construe the parents' argument as a challenge to the manifest weight of the evidence, I would not have excused their failure to comply with the explicit requirement of App.R. 16(A) that they separately assign an error and support it with a legal argument. See, also, App.R. 12(A)(2).

{¶ 34} The interpretation of the statute is not an easy one. The parents have exasperated our constitutional obligation by presuming that we would be an activist court and would act without legal authority. I choose not to make the parents' case below, preserve the record, raise the assignments of error, create law that does not exist, or change law that does exist.