Lundberg Stratton, J.
{¶ 1} Today this court must consider the narrow legal issue of whether the Summit County Probate Court exceeded its statutory authority when it appointed a guardian with the power to authorize the withdrawal of all life-sustaining support and treatment for Aiden Stein, an infant. Although the unique facts of this case are tragic and raise many issues, this case does not require us to decide whether either of Aiden Stein’s parents abused him or whether Aiden’s father, appellant Matthew Stein, is guilty of any criminal charges. It does not require us to decide whether it would be in Aiden’s best interest to have life-supporting *31 treatments withdrawn and comfort care administered or whether the constitutional rights of his parents were violated. Rather, this case involves a narrow legal issue of statutory authority.
{¶ 2} For the reasons that follow, we conclude that the probate court exceeded its statutory authority, and we, therefore, remand the cause to the Summit County Probate Court to amend the guardianship order to remove the portion of the order authorizing the guardian to withdraw life-supporting treatment for Aiden.
History
{¶ 3} On March 15, 2004, five-month-old Aiden Stein was taken from his home to MedCentral Hospital, Mansfield, in Richland County by emergency transport. When Aiden arrived at MedCentral, he was in critical condition, not moving, and unable to breathe on his own. He was placed on a mechanical ventilator, resuscitated, and transferred to Akron Children’s Hospital Medical Center of Akron in Summit County.
{¶ 4} Upon arrival at Children’s Hospital, Aiden was found to have excessive amounts of blood on his brain. He was moved to the critical care unit, where doctors attempted to drain some of the excess blood from his head. In the emergency department, Aiden was diagnosed as having suffered a traumatic brain injury.
{¶ 5} Dr. Richard D. Steiner, D.O., an attending physician in the emergency department at Children’s Hospital, was called to evaluate Aiden soon after his arrival. Dr. Steiner testified that because of the child’s age, there was a suspicion by the emergency room physicians that Aiden may have suffered the injury as a result of abuse.
{¶ 6} Aiden’s sole caretaker on the day he sustained these injuries was his father, Matthew Stein (“Stein”). In addition, there was evidence of a possible prior incident of abuse, regarding which neither parent could be ruled out as a suspect. On March 16, 2004, appellee Richland County Children Services Board (“RCCSB”) was granted emergency temporary custody of Aiden based upon the above diagnosis and allegations that the injuries were inflicted by Stein, with whom Aiden’s mother, appellant Arica Heimlich, was residing.
{¶ 7} Aiden’s prognosis, based on a reasonable degree of medical certainty, is that he will have no awareness of or ability to interact with his environment other than reflexive actions. Three of four doctors who testified at the hearing opined that, at best, Aiden’s outcome would be a permanent unconscious state, also described as a persistent vegetative state.
{¶ 8} Due to Aiden’s diagnosis and prognosis, the Children’s Hospital Ethics Committee was consulted regarding ethical issues involved in continuing, limiting, *32 or withdrawing life-supporting treatment for Aiden. The ethics committee is a multidisciplinary group of people, including physicians, nurses, therapists, community members, clergy, and legal counsel, and is not associated with the hospital. Because Stein was under suspicion of causing Aiden’s injuries, and because Heimlich remained allied with Stein after the alleged abuse, the committee recommended that due to the significant potential for a conflict of interest, a guardian should be appointed to help make medical decisions for Aiden. In addition, the ethics committee recommended that life-supporting treatment be withdrawn and comfort care be administered to Aiden.
{¶ 9} On April 6, 2004, at the request of Children’s Hospital, appellee Ellen Kaforey applied to the Summit County Probate Court for appointment as Aiden’s guardian “to evaluate and determine the withdrawal of life-sustaining medical treatment currently being administered” to Aiden. Kaforey is an attorney and a registered nurse who is often called upon by the probate court to assist families in cases where medical decisions need to be made for a family member.
{¶ 10} The Summit County Probate Court held an evidentiary hearing on Kaforey’s application on April 14, 16, 21, and 22, 2004. At the hearing, testimony was taken from Aiden’s parents, Stein and Heimlich, Dr. John Pope, Ellen Kaforey, Michelle Renee Flaherty (an investigator for RCCSB), Dr. Richard Steiner, Janet Roberts (a licensed practical nurse), Leanne Sessler (sister of Arica Heimlich), Dr. Max Wiznitzer, and Dr. Paul A. Byrne.
{¶ 11} Dr. John Pope, a pediatrician and critical care pediatric specialist at Children’s Hospital, testified that Aiden’s condition was consistent with shaken baby syndrome. He testified that Aiden had “tremendous intracranial injuries inside of his skull, blood around his brain, as well as significant evidence on [the] CT of injury to the brain itself, and also had a significant amount of bleeding in the back of his eyes or retinal hemorrhages. These injuries without a history of an immediately preceding significant traumatic event are only consistent with shaken baby syndrome.”
{¶ 12} Dr. Pope testified that Aiden “not only suffered from the bleeding and the direct traumatic injury, but the brain, his upper brain, the cortex, the parts of the brain that makes us who we are, suffered for some period of time [from] inadequate oxygen and inadequate blood flow.”
{¶ 13} Further, Dr. Pope testified that Aiden’s most recent CAT scan at that time, which was March 22, “showed that part of the brain to be essentially completely black which is an indication that that part of the brain is dead.” A subsequent x-ray showed that Aiden also had a fractured skull, which Dr. Pope testified was consistent with a “discard injury,” occurring when a victim of shaken baby syndrome is tossed aside after having been shaken. Dr. Pope testified that *33 Aiden was the victim of shaken infant syndrome and that he will remain in a persistent vegetative state until he dies.
{¶ 14} Dr. Steiner, attending physician at Children’s Hospital Department of Emergency Medicine, testified that Aiden was the victim of shaken infant syndrome, and he concurred with Dr. Pope’s prognosis that Aiden will remain in a persistent vegetative state until he dies.
{¶ 15} Dr. Max Wiznitzer, appointed by the court as an independent medical reviewer, is on staff at Rainbow Babies and Children’s Hospital, Department of Pediatrics, and at University Hospitals of Cleveland, Department of Neurology. Dr. Wiznitzer testified that Aiden was the victim of shaken infant syndrome and that he will remain in a persistent vegetative state until he dies.
{¶ 16} Dr. Paul Byrne testified on behalf of Aiden’s parents. Dr. Byrne testified that he had examined Aiden and reviewed the file and concluded that Aiden’s injuries were not caused by shaken infant syndrome. Rather, Dr. Byrne testified that Aiden had a preexisting condition and that an unspecified acute event sent him into respiratory arrest. He testified that the withdrawal of life-sustaining medical treatment was not appropriate. When asked whether there are any circumstances where the withdrawal of life-sustaining medical treatment is ethically appropriate, Dr. Byrne responded, “Let’s put it this way, I haven’t seen that.”
{¶ 17} On the second day of the hearing, the parties reached an agreement that the court could move forward to appoint Ellen Kaforey as the guardian of Aiden Stein for limited purposes, defined to include making all medical decisions with the exception of the withdrawal of life-sustaining treatments; for Aiden Stein from that point forward until further order of the court.
{¶ 18} Following the hearing, on April 29, 2004, the probate court appointed Ellen Kaforey as “limited guardian” of Aiden Stein, but, despite the agreement, ordered that her powers include (1) giving consent to all medical treatment, (2) withdrawing all life-sustaining support and treatment, (3) requesting a do-not-resuscitate order, (4) directing the infant’s medical care providers to cease all medical treatment that would prolong the life of the infant, and (5) making recommendations regarding Aiden’s eventual disposition if he requires posthospital care elsewhere.
{¶ 19} R.C. 2133.08 authorizes the removal of life-sustaining treatment for terminally ill adults. However, the probate court concluded that R.C. 2133.08 “arguably” does not apply to minors, and, therefore, the court instead derived its authority from R.C. 2111.06, a general statute that authorizes the probate court to appoint a guardian to make medical and other decisions for a minor if the parents are unsuitable.
*34 {¶ 20} The Summit County Court of Appeals affirmed the judgment of the probate court on June 9, 2004. In re Guardianship of Stein, 157 Ohio App.3d 417, 2004-Ohio-2948, 811 N.E.2d 594. This court granted the appellant parents’ motion to stay execution of the court of appeals’ judgment on June 11, 2004. In re Guardianship of Stein, 102 Ohio St.3d 1475, 2004-Ohio-2995, 810 N.E.2d 441.
{¶ 21} This cause is now before us upon our acceptance of a discretionary appeal.
Jurisdiction
{¶ 22} R.C. 2101.24(A)(1) defines the jurisdiction of the probate court:
{¶ 23} “Except as otherwise provided by law, the probate court has exclusive jurisdiction:
{¶ 24} “* * *
{¶ 25} “(e) To appoint and remove guardians * * *.”
{¶ 26} The probate court concluded that Aden is a resident of Summit County as required by R.C. 2111.02(A), a conclusion with which we agree. A minor’s resident status is to be construed consistently with the best interest of the minor. See In re Fore (1958), 168 Ohio St. 363, 369, 7 O.O.2d 127, 155 N.E.2d 194. Further, “residence” refers to a place of dwelling within the state. Id. at 371, 7 O.O.2d 127, 155 N.E.2d 194. Since being admitted to Akron Children’s Hospital on March 15, 2004, Aden has been residing in Summit County on a 24-hour, seven-day-per-week basis. Moreover, the parties do not appear to contest the probate court’s finding of residency or of jurisdiction. We, therefore, hold that Aden is a resident of Summit County for purposes of this case under R.C. 2111.02(A), and the probate court had jurisdiction to consider these questions.
Guardianship
{¶ 27} “[A] parent’s desire for and right to ‘the companionship, care, custody and management of his or her children’ is an important interest that ‘undeniably warrants deference and, absent a powerful countervailing interest, protection.’ ” Lassiter v. Dept. of Social Serv. (1981), 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640, quoting Stanley v. Illinois (1971), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551.
{¶ 28} Ellen Kaforey filed for guardianship of Aden Stein after the Ethics Committee at Akron Children’s Hospital concluded that Aden’s parents have a conflict of interest regarding Aden’s care due to the potential for enhanced criminal charges if Aden dies. R.C. 2111.06 provides that “[a] guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor.”
*35 {¶ 29} The probate court granted that application and granted to Kaforey the authority to withdraw life-supporting treatments for Aiden. Stein and Heimlich contend that any decision to remove life-supporting treatment from Aiden would have the effect of terminating their parental rights without due process. The RCCSB and Guardian Kaforey argue that if life-supporting treatments are withdrawn and Aiden dies, it would be the neurological injuries Aiden sustained that would be the cause of death, not the act of withdrawing the life-supporting treatments.
{¶ 30} R.C. 2133.08, part of Ohio’s version of the Uniform Rights of the Terminally 111 Act, is the only Ohio statute that explicitly authorizes the removal of life-sustaining treatment. The statute, by its very terms, however, applies only to adults. R.C. 2133.08(A)(1). If a statute is unambiguous, we must apply it as written. State v. Hairston, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 13. See, also, State v. Hughes (1999), 86 Ohio St.3d 424, 427, 715 N.E.2d 540 (“In construing a statute, we may not add or delete words”). If the General Assembly wanted to apply R.C. 2133.08 to minors, it could have expressly done so. Because it has not, we will not extend the statute’s application by judicial decree. Thus, the probate court correctly concluded that R.C. 2133.08 does not permit the withdrawal of life-sustaining treatment for a minor.
{¶ 31} The probate court then turned to R.C. Chapter 2111, concerning guardianships and conservatorships. Specifically, R.C. 2111.50(F) provides that “[w]hen considering any question related to, and issuing orders for, medical or surgical care or treatment of incompetents or minors subject to guardianship, the probate court has full parens patria powers unless otherwise provided by a section of the Revised Code.” Moreover, R.C. 2111.06 provides that “[a] guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor.”
{¶ 32} Aiden’s parents have been considered unsuitable due to the conflict of interest that exists in this case, namely, if life-supporting treatments are withdrawn, Aiden will die, and if Aiden dies, his father, who was the sole caretaker on the day Aiden sustained his injuries, could be charged with murder, as he is suspected of injuring the baby. Further, Aiden’s mother, Heimlich, who resides with and has since become engaged to Stein, does not believe that Stein caused Aiden’s injuries, and neither can be ruled out as having caused a possible prior incident of abuse.
{¶ 33} In accordance with R.C. 2111.06, the probate court in this instance concluded that it had the jurisdiction to appoint a guardian for the purpose of making or recommending medical decisions for Aiden, including life-and-death issues of removing life-sustaining treatments. We find, however, that the deci *36 sion to withdraw life-supporting treatments goes beyond the scope of making medical decisions.
{¶ 34} The Richland County Juvenile Court placed Aiden in the emergency temporary protective custody of the RCCSB on March 16, 2004. On October 26, 2004, at the time this court heard this case on the merits, permanent custody of Aiden had not been determined, and he remained in the temporary custody of the RCCSB.
{¶ 35} In this case, the parents’ rights have been merely suspended, not terminated. We acknowledge the argument that the abuse would be the true proximate cause of Aiden’s death should life-supporting treatments be withdrawn. However, many scenarios are possible in this unique case, such as the possibility that Heimlich could choose to leave Stein and seek sole custody of Aiden. If it cannot be established that she participated in any of the possible instances of abuse, there may not be grounds to deny her reunification with her son. The fact that a child is in a permanent vegetative state is not a sufficient reason to deny parental rights, absent evidence of abuse or neglect. The right to withdraw life-supporting treatment for a child remains with the child’s parents until the parents’ rights are permanently terminated.
{¶ 36} “The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.” Santosky v. Kramer (1982), 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599.
{¶ 37} We conclude that the probate court’s order authorizing the guardian to withdraw life-supporting treatments has the effect of terminating parental rights. We, therefore, hold that the probate court exceeded its statutory authority in granting the guardian the power to withdraw life-supporting treatments before the parents’ rights were permanently terminated. If the Richland County Juvenile Court permanently terminates the parental rights of Stein and Heimlich, the guardian will then fully stand in the shoes of the parents. Until then, the granting of authority to withdraw life-supporting treatment for Aiden is premature.
{¶ 38} The heartbreak and tragedy in this case cannot be overstated. However, we believe that without a full and proper adjudication of parental rights concluding in a termination of those rights, a probate court has no authority to *37 allow a guardian to make a decision that will terminate the life of a child, when parental rights have not been permanently terminated, thereby terminating the parent-child relationship. Accordingly, because the parties have otherwise stipulated to the order of the Summit County Probate Court, we remand the cause to the Summit County Probate Court to amend the guardianship order to remove the portion of the order authorizing the guardian to withdraw life-supporting treatments for Aiden.
Judgment reversed and cause remanded.
Resnick and F.E. Sweeney, JJ., concur.
O’Donnell, J., concurs separately.
Moyer, C.J., concurs in part and dissents in part.
Pfeifer, J., concurs in part and dissents in part.
O’Connor, J., dissents.