DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant David Sauers ("Father") appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, denying Father legal custody of his son J.S., d.o.b., May 16, 1991, and placing J.S. into a Permanent Planned Living Arrangement ("PPLA") with Summit County Children Services Board ("CSB"). We affirm.
 {¶ 2} This matter began when Father signed a complaint in 2005, indicating that J.S. was a delinquent child by reason of domestic violence, in violation of R.C. 2919.25. J.S. admitted to the allegations, was adjudicated a *Page 2 
delinquent child and placed on three months probation. On November 8, 2005, J.S. was charged with a probation violation for failing to attend counseling and school and failing to obey house rules. On December 14, 2005, J.S. admitted the allegations and the court found that he had violated his probation. On December 20, 2005, the trial court issued its judgment entry related to the December 14, 2005 disposition hearing finding that "[a] very volatile situation exists in Father's home * * * [and that J.S.] reported that he was hit in the face and taunted by Father." The trial court then ordered that J.S. be placed in the emergency temporary custody of CSB. The December 14, 2005 entry also continued the dispositional hearing until December 30, 2005, which date was later continued to January 19, 2006. Father was present at the December 14, 2005 hearing and a copy of the trial court's December 16, 2005 entry was mailed to Father.
 {¶ 3} On January 18, 2006, October 25, 2006, and January 2, 2007, original and amended case plans, prepared by CSB and signed by Father, were filed with the trial court. On January 25, 2006, subsequent to the January 19, 2006 disposition hearing, at which Father was present with counsel, the trial court ordered, in relevant part, that J.S. would remain in the temporary custody of CSB and that father was to have one hour per week of supervised visitation. A guardian ad litem was also appointed to represent Father's best interests.
 {¶ 4} On April 26, 2006, Father filed a motion requesting that J.S. be returned to his custody, which motion CSB opposed and the trial court denied on *Page 3 
October 27, 2006, after a trial. The October 27, 2006 judgment entry found that the CSB had made reasonable efforts to return J.S. to his Father's custody, but that his return would be contrary to J.S.'s best interest.
 {¶ 5} On January 19, 2007, CSB moved the trial court to modify its order of disposition from temporary custody to a PPLA pursuant to R.C.2151.415(C)(1). On February 12, 2007, Father again moved for legal custody of J.S. The trial court set a hearing date of June 19, 2007, to consider both motions and an in-camera interview of J.S. was set for June 20, 2007.
 {¶ 6} The hearing proceeded as scheduled. Present at the hearing were the prosecuting attorney, CSB caseworker, Father, attorney for Father, guardian ad litem for Father, attorney/guardian ad litem for J.S., and J.S.'s probation officer. On July 12, 2007, the trial court entered judgment ordering that J.S., then sixteen years old, be placed in a PPLA ("Judgment Entry"). The trial court issued the Judgment Entry after finding, by clear and convincing evidence pursuant to R.C. 2151.415(C), that a PPLA was in the best interest of J.S. The Judgment Entry noted that J.S. did not want to live with his father because of alleged prior abuse; that there were no other available living options and that J.S. was doing well in his current placement. The Judgment Entry also found that Father's psychological issues when coupled with J.S.'s refusal to have anything to do with his Father made granting legal custody to Father inappropriate. *Page 4 
 {¶ 7} Father timely appealed the Judgment Entry and has raised two assignments of error.
 Assignment of Error No. I "It is error for the court to grant planned permanent placement of a child when there is no finding of abuse, dependency, or neglect and the only complaint before the court is a delinquency complaint against the child[.]
 "[Father] was not given due process in that the required procedural safeguards were never followed and improper procedures endured throughout this case denying [Father] due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, and Article 1, § 16 of the Ohio Constitution.
 "A. Summit County Children Services Board did not use reasonable efforts to reunify the child with the father and did not assist with visitation efforts as ordered by the court and failed to prove that they have so made reasonable efforts." (Emphasis sic).
 {¶ 8} Father asserts that the trial court was without authority to order that J.S. be placed in a PPLA as the only issue before the court was the delinquency of J.S. and that by doing so, Father's due process rights were violated. Father maintains that the issue of abuse, dependency or neglect was not before the trial court and that the trial court was required to make such a finding before ordering a PPLA. We disagree. We will discuss Father's argument that the CSB did not use reasonable efforts to reunify J.S. with his father and failed to assist with visitation efforts in our discussion of Father's second assignment of error. *Page 5 
 {¶ 9} Father did not object to the trial court's consideration of CSB's motion to place J.S. in a PPLA. The trial court stated the purpose of the hearing, without objection from Father:
 "[W]e are here today set for trial on the motions that are pending before the court, those being for [J.S. and D.S.] to both be placed in planned permanent living arrangement with Summit County Children Services Board."
The trial proceeded only as to the disposition of J.S. because Father agreed to the placement of his other son, D.S., in a PPLA. Father indicated that he opposed a PPLA for J.S. and wished to pursue custody of J.S., pursuant to his motion.
 {¶ 10} Because Father failed to object to the trial court's consideration of CSB's motion for a PPLA, "[w]e will not reach the merits of this assigned error because it has not been preserved for appellate review." In re Guardianship of Stein (2004),157 Ohio App.3d 417, 420, 2004-Ohio-2948, at ¶ 8, reversed on other grounds by105 Ohio St.3d 30, 2004-Ohio-7114. "It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." State v. Childs (1968), 14 Ohio St.2d 56,43 O.O.2d 119, paragraph three of the syllabus. "Constitutional rights may be lost as finally as any others by a failure to assert them at the proper time." Id. at 62.
 {¶ 11} Father asserts that the PPLA action should not have gone forward absent a dependency, abuse or neglect hearing and a finding by the court related *Page 6 
thereto. Father maintains that the trial court violated his due process rights in proceeding with the PPLA hearing. "To timely assert such a challenge, at a minimum, [Father] should have raised an affirmative objection prior to, or at least at the commencement of, these proceedings." In re Stein, 2004-Ohio-2948, at ¶ 10. Instead, as noted above, Father participated, without objection, in the hearing, which was announced at the beginning of the hearing to be one based on Father's motion for custody and CSB's motion for a PPLA and Father's counsel acknowledged the purpose of the hearing. Moreover, Father's counsel and guardian ad litem were served with CSB's PPLA motion on or about January 22, 2007, more than five months prior to the hearing.
 {¶ 12} Father raised the issue of his constitutional rights for the first time during this appeal, "when it was clearly too late for the trial court to correct the alleged error." Id. at ¶ 12. Because Father failed to timely raise this alleged error in the trial court, we will not reach the merits of his constitutional challenge.
 {¶ 13} Father's first assignment of error is overruled.
 Assignment of Error No. II "The court's conclusions are based on mere speculation and not upon evidence produced in the record and are in no way supported by the evidence adduced at dispositional hearing such that disposition was error.
 "The child was removed from [Father] through a planned permanent living arrangement with evidence insufficient as a matter of law thereby denying [Father] due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, and Article I, § 16 of the Ohio Constitution. *Page 7 
 "The state failed to carry its burden of proving the case by clear and convincing evidence in that the evidence is insufficient to allow a finding granting planned permanent living arrangement such that the decision of the court is against the manifest weight of the evidence. [Father] demonstrated that he was a sound and fit father and that the child was not dependent." (Emphasis sic).
 {¶ 14} Father asserts that the trial court's decision ordering a PPLA was against the manifest weight of the evidence and was not supported by sufficient evidence. Father further maintains that a PPLA was not in the best interest of J.S. We disagree.
 {¶ 15} The Supreme Court of Ohio noted that the standards of sufficiency and manifest weight are merged in the civil context and set forth the manifest weight standard in State v. Wilson,113 Ohio St.3d, 382, 2007-Ohio-2202, at ¶ 24, stating:
 "[T]he civil manifest-weight-of-the-evidence standard was explained in CE. Morris Co. v. Foley Constr. Co., 54 Ohio St.2d 279, syllabus (`Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence'). We have also recognized when reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80-81. This presumption arises because the trial judge had an opportunity `to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' Id. at 80. `A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.' Id. at 81." Wilson at 24. *Page 8 
 {¶ 16} The trial court ordered the PPLA pursuant to R.C.2151.415(C)(1), which states, in relevant part:
 "If an agency pursuant to division (A) of this section requests the court to place a child into a planned permanent living arrangement, the agency shall present evidence to indicate why a planned permanent living arrangement is appropriate for the child, including, but not limited to, evidence that the agency has tried or considered all other possible dispositions for the child. A court shall not place a child in a planned permanent living arrangement, unless it finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the following exists:
 "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care."
 {¶ 17} Clear and convincing evidence is:
 "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. Where the evidence is in conflict, the trier of fact may determine what evidence should be accepted and what evidence should be rejected. As a reviewing court, we must examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." (Internal citations, quotations, and alterations omitted.) In re Dukes (1991), 81 Ohio App.3d 145, 153.
 {¶ 18} The trial court found, and we agree, that it was in the best interest of J.S. to order the PPLA. First, J.S. did not want to live with his Father because of Father's abusive tendencies, as J.S. stated during an in-camera interview with the trial judge. Moreover, four witnesses testified on behalf of CSB in support of the trial court's conclusion that the PPLA was in J.S.'s best interest. Father and his girlfriend testified on behalf of Father. *Page 9 
 {¶ 19} Robert White is an outpatient therapist at Child Guidance and Family Solutions ("CGFS"). Mr. White was Father's therapist after he was referred to CGFS. Mr. White testified that he diagnosed Father with an adjustment disorder. As part of his therapy, Mr. White explained that he asked Father to write a letter to both of his sons to try to form some sort of connection, but Father never wrote the letters. Mr. White testified that therapy was discontinued because the skill (the letters), taught to Father, was not used so that future therapy would not be productive. Mr. White rated Father's progress in terms of improving family functioning as minimal.
 {¶ 20} Dr. Arcangela Wood is a clinical psychologist at Summit Psychological Associates. Dr. Wood treated Father after a referral by CSB. Dr. Wood testified that she had two sessions with Father in March 2006, and that Father was cooperative. However, based on information learned during her sessions with Father, Dr. Wood diagnosed Father with alcohol dependence, cannabis abuse, and borderline personality disorder and made various recommendations, including parenting classes and individual counseling to "focus on decreasing his maladaptive personality characteristics as well as increasing his empathy for his children and the emotional problems that his children were experiencing at the time." Dr. Wood also recommended that Father abstain from alcohol and participate in random drug screens. Dr. Wood finally recommended that J.S. not be returned to the Father until he completed the recommendations *Page 10 
because "without receiving treatment for the traits and the problems [Father] has with this disorder" Father's custody of J.S. would be detrimental to J.S. Dr. Wood had no knowledge of Father's treatment after she made her recommendations.
 {¶ 21} Among the behaviors that caused Dr. Wood to make her recommendation was Father's acknowledgement that he knew of no other way to discipline J.S. other than via corporal punishment with a belt. Dr. Wood also testified that Father was unaware of J.S.'s mental health diagnosis but was fully aware of J.S.'s extensive legal history. Dr. Wood further stated that although Father told her he had completed several parenting classes, he was not able to give her an example of any skill he learned in the classes. Dr. Wood testified that Father told her about his drug and alcohol dependency, including his unsuccessful attempts to abstain. Dr. Wood stated that J.S.'s problems caused Father stress and that "under the influence of alcohol * * * [Father] didn't care about anybody else and was really caring about himself[.]"
 {¶ 22} Shannon Imhoff is a counselor at Cornell Abraxis ("CA"), an inpatient drug and alcohol treatment facility for adolescents. Ms. Imhoff treated J.S. after a referral from CSB. Ms. Imhoff testified that J.S. had a substance abuse problem when he came to CA. Ms. Imhoff testified that J.S. had animosity and resentment towards Father and did not want to live or visit with him. J.S. told Ms. Imhoff that Father had physically abused him and his brother. Ms. Imhoff further indicated that J.S. told her that if he was forced to live with Father, he *Page 11 
would do whatever he had to do to get out of that situation. Ms. Imhoff explained that her concern was that J.S. would harm Father if returned to the family home.
 {¶ 23} Danielle Hampton is a protective social worker at CSB. She testified that she was assigned as the caseworker for the Sauers family. Ms. Hampton testified that she prepared and filed a case plan in the Sauers case, which was reviewed with Father. The goal of the case plan was to reunify J.S. with Father and placing J.S. with a relative in the meantime, the latter of which was not possible. Ms. Hampton testified that the first objective of the case plan was for Father and J.S. to refrain from using drugs or alcohol. Both Father and J.S. completed this objective.
 {¶ 24} Ms. Hampton testified that the second objective of the case plan was for Father and J.S. to address their emotional and behavioral issues in a therapeutic setting. Ms. Hampton stated that Father did not achieve this objective as he was terminated from CGFS. J.S. was in the process of completing this objective. Ms. Hampton testified that to her knowledge Father had not sought counseling at any other agency.
 {¶ 25} Ms. Hampton testified that the next objective of the case plan was for Father to demonstrate age-specific parenting techniques. Ms. Hampton referred Father to Greenleaf to attend parenting classes and testified that he did attend those classes. However, Ms. Hampton stated, the counselors at Greenleaf indicated that Father had a "lack of insight in parenting skills" and would often *Page 12 
come up with "off-the-wall" answers to questions posed in class. Ms. Hampton testified that she continued to have concerns that Father could effectively parent J.S. and recommended that he continue counseling. Ms. Hampton indicated that Father could not articulate to her skills he had learned in parenting class and had, therefore, not completed this portion of the case plan.
 {¶ 26} Ms. Hampton testified that another case plan objective was for Father to complete a psychological assessment, which Father completed. Ms. Hampton indicated that the recommendation of the assessment was that J.S. not be returned home until Father successfully completed counseling. Thereafter, Father completed six sessions of counseling, but Ms. Hampton stated that she has never been notified that Father has obtained any further counseling.
 {¶ 27} Ms. Hampton testified that it had been more than a year since J.S. had visited with Father at the visitation center and visits were officially suspended because J.S. refused to visit with him and J.S.'s counselors recommended that visitation be suspended. She stated that it is not CSB policy to force visitation where a child refuses and it is not recommended by the child's counselor. Ms. Hampton indicated that Father did send cards to J.S. while he was at CA, but J.S. shredded them and did not write back to Father. Ms. Hampton indicated that never in two years had a teenage client refused to see his or her parent.
 {¶ 28} Ms. Hampton testified that J.S. is currently living in a therapeutic foster home. Ms. Hampton indicates that J.S. is willing to accept a PPLA and is *Page 13 
on a waiting list for independent living. Ms. Hampton explained that CSB has considered all placement options and believes that long-term foster care (a PPLA) is in the best interest of J.S.. Ms. Hampton explained that J.S. is not ready to go home and that several of his counselors have indicated that J.S. should not go home because of the volatile situation there. The goal with regard to the PPLA, indicated Ms. Hampton, is for J.S. to remain in his current placement because he is thriving there, going to school, being more respectful, and not using drugs. Ms. Hampton testified that it is her recommendation that any visitation with Father be left to J.S.'s discretion and only be conducted in a therapeutic setting.
 {¶ 29} Angela Wiley has been Father's girlfriend for one year. Ms. Wiley testified that Father interacts well with her three children and that she has no reservations about letting Father take care of them when she works. Ms. Wiley further testified that Father handled himself well in a stressful situation involving her ex-husband. Ms. Wiley observed one meeting between J.S. and Father and noted that there had not been a confrontation. Ms. Wiley finally testified that she had never seen Father physically discipline his children and that there had never been an incident of domestic violence involving her. Ms. Wiley did testify that Father told her that J.S. had threatened him.
 {¶ 30} Father testified he is a recent college graduate and owns his home. He is currently employed at Dave's Market. Father testified that he filed delinquency charges against J.S., which resulted in J.S. being placed in the *Page 14 
custody of CSB. Father insisted that he had never physically abused J.S., although he acknowledged occasional physical altercations with J.S.
 {¶ 31} Father testified that he does not consume drugs or alcohol and does not smoke. Father further testified that he has complied with all aspects of the case plan, although CSB made it difficult. Father acknowledged that he made a mistake in forgetting to bring the letters he wrote to J.S. to his counseling sessions with CGFS. Father stated that he has been diligent in trying to visit with J.S. and persists despite J.S.'s refusal because he believes visitation is in J.S.'s best interest. Father disagreed with Father's psychological assessments.
 {¶ 32} Father testified as to a parenting skill he learned in parenting classes and explained that he would take time to calm himself before dealing with adversarial situations between he and J.S. should J.S. return home. Father testified that corporal punishment would not be an appropriate means to discipline J.S. Father further explained that the strained relationship between he and J.S. was aggravated by the presence of Father's other son, D.S., who was addicted to cocaine and a gang member. Father maintained that since D.S. has been placed in a PPLA, it would be now easier for him to parent J.S. Father acknowledged that he had heard about and was concerned about threatened conflict with J.S. should J.S. return home. Father indicated he would call the police if such violence occurred. *Page 15 
 {¶ 33} Father testified that he is the best person to teach J.S. how to overcome obstacles because he did it himself. Father finally testified that he has changed since 2005, when J.S. was removed from the home. He maintained that he had learned to have more empathy towards his children and learned better self-control. He learned how to build self-esteem through encouragement and that it was his job to help them understand and process his children's feelings so that they can make good choices. Father indicated that the only stress he has in his life is the lack of a relationship with his children.
 {¶ 34} J.S. spoke to the trial judge in chambers in the presence of J.S.'s probation officer. J.S. understood the purpose of the hearing was to determine if J.S. would be returning home or be placed in a PPLA. J.S. told the judge that he did not want to live with Father because of physical abuse by Father. In the past, Father had promised to stop hitting him and then would start again. J.S. believed that Father only wanted him home so Father could collect food stamp money. J.S. indicated that Father had beaten him, nailed his windows shut, and would not let him out of his bedroom in the past.
 {¶ 35} J.S. indicated that were he to be placed in a PPLA, he did not want to visit Father, even in a supervised setting. J.S. indicated that he is doing better in foster care and has been working sporadically in construction with a goal of finding a part-time job with a regular schedule. *Page 16 
 {¶ 36} Based on the foregoing, we find there to be clear and convincing evidence that it is J.S.'s best interest to be placed in a PPLA and that CSB made reasonable efforts to reunify Father with J.S.. J.S. is doing well in his current foster home and evidence at trial demonstrated a likelihood that physical violence would occur between J.S. and Father should he return home at this time. Moreover, J.S., who is sixteen years old, indicated that he does not want to go home and/or visit with his Father. Accordingly, we agree with the trial court that J.S. is unable to function in a family-like setting and must remain in residential or institutional care. R.C. 2151.419(C)(1).
 {¶ 37} Father's second assignment of error is overruled.
 {¶ 38} Each of Father's assignments of error is overruled and the judgment of the trial court is affirmed.
Judgment Affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27. *Page 17 
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 WHITMORE, J., DICKINSON, J. CONCUR
 *Page 1