Birchard, J.
Several questions of interest have been presented for our consideration in the argument at bar, and in the briefs of counsel. We shall notice them severally, especially those that seem to us conclusive of the rights of the parties.
One subject of great diversity of opinion among counsel, is presented by the deed of Canby and wife, executed in 1825. Plaintiffs’ counsel contend that it is defectively executed, inasmuch as the certificate of acknowledgment is insufficient. Were this so, it is difficult to see how it could affect this action. While Canby, the husband, lives, the right of possession to the lands of the wife is in him; and his deed, if valid, passed whatever right of possession the wife had. No proof of his decease has been adduced.
*423 But we will notice the deed. The substantial portion of the certificate of acknowledgment, is in these words : “ Personally ‘ came Joseph Canby and Margaret H. Canby, the within gran- ‘ tors, and acknowledged, severally, the signing and sealing of ‘ the within deed of quit claim to be their voluntary act and c deed, for the uses and purposes therein contained. Arid the ‘ said Margaret being by me made known to the contents, and ‘ examined separate and apart from her said husband, declared ‘ that she signed the same without fear or coercion of her said ‘ husband, and of her own free will and accord.”
The statute required that on the separate examination, the wife should acknowledge the signing and sealing of the deedj and that this should be certified by the magistrate; 2 Chase’s Stat. 1139. Brown v. Farren, 3 Ohio Rep. 140, is an authority recognized iri Connell v. Connell, 6 Ohio Rep. 353, and is at this time the law of the State. The doctrine established there, is, that words used in the certificate of acknowledgment, which are equivalent to the words of the statute, are sufficient. Let us consider, then, whether this deed, and the certificate, do not show that every requisite of the statute has been complied with in substance and in fact.
The signing and sealing, and delivery, were all done at the same time. This appears from the testatum clause of the deed, and from the attestations of the subscribing witnesses. The signing and sealing are one act, done at the same time. The signature adopted the seal already prefixed, and made the same the seal of the grantor; so that, in point of fact, there could be no separation. If the signing was done voluntarily, it is impossible the sealing was not equally so. What does the certificate show ? That Mrs. Canby united with her husband and acknowledged both the signing and sealing. When separately examined, she said the act thus done was her voluntary act and deed.
It is easy to see how all this actually occurred and to understand what it all meant. No man unlearned in the law, if of sound sense, reasoning fairly, and untrammeled by techni *424 calities, would ever1 come to the conclusion that Mrs. Canby * did not mean to acknowledge the execution of the deed, or that the magistrate had not so certified. Apart 'from legal subtleties, and guided by the '.lights of sound logic; every man would-:come to the same conclusion, and.would "assert, that by .no possibility coiild any evil arise from .holding such a certificate to be a full compliance with the statute ^ full' evidence' that the sealing, as - well as the signing, was acknowledged* We think the deed is well executed to "pass .the title of Mrs. Canby, and will next consider whether the descriptive words of the instrument embrace the land'in controversy.
The land.is thus'described: “All our right, title,"claim,.in? ‘ terest, property or demand, of,"'.in and to all real estate which"' ‘ had fallen^ or may- "fall" tp .us, hr either‘of us', as heirs of legal .‘representatives "of" Marquis- He Lafayette "Hajnes, deceased,’- ". ‘ pr of Amos ..Haines,- deceased.”' , -
' Numerous' authorities, have been" adduced,, in "the hope of. satisfying, us “ that this .deed is so" general,in its- terms, it, em- ‘ braces' nó land whatever," ".and .is, therefore void, for uncertain- - ‘ ty, and cannot be made to pass title to any lands, without ex- ‘ trinsic evidence-is. resorted to.” The-terms."of the deed are ample; They are such as may be readily comprehended, and speak an-intention pn the part of the grantor that admits of no doubt. Whatever title, legal of equitable, descended to the grantors, .or heirs of the two Haines, passed by the conveyance.' Plainer words, pr more apt to express that intention, could not be found. Extrinsic evidence in such a case can only be to-identify . the. land ■ embraced by- the description. It should show lands "to' which either of the decedents had an equity. The deed transferred’-it. So if the deceased had, as in this case, a naked legal title, that also passed. Right, title, claim, interest., or property, are words of -a most cqmprehensive meaning. Here they are disjunctively connected, and embrace every thirig that came by descent to the grantors.
One more objection to this deed remains to be disposed of. It is said the magistrate, in taking the acknowledgment of Noah *425 and Nathan Haines, has not affixed his seal. If this were so, the deed would be well executed under the- existing state of the law. The second section of the statute (Swan’s Stat. 269) declares, that the deed shall be held sufficient to pass the legal title, notwithstanding the omission. The words are, “ shall be good and valid in law and equity.” The statute purports to act retrospectively — not to create title where none existed before, but to make that a good title which the parties themselves meant to make good, by dispensing with a part of the form required of the officer, and by him carelessly and negligently omitted. This statute has been repeatedly under the examination of this Court upon the circuit, and has received the sanction of all its members, as a law of binding force. It violates the obligation of no contract, divests no vested right; but on the contrary supports a contract fairly and honestly made, and such an one as a court of chancery would have enforced.
Again: does this question of law arise upon this deed? The magistrate commences the certificate of acknowledgment thus:
“ The State op Ohio, v £ Warren County, ss. > £ [seal.] ' Personally,” &c.
And at the conclusion signs his name. ' The law has not made it the duty of the officer to place his seal at the end of the certificate, immediately after his signature ; and, I take it, the seal placed as this is, is his seal, so that, in point of fact, no such question as the one last disposed of could have been forced upon us, or would have been decided, but for the desire of the parties to have settled every question which, by possibility, can be raised upon plausible grounds, touching this title. It has been much litigated already, and they have no reason to expect peace until they have a decided opinion upon every question agitated in the cause. The deed of Robert Haines is not objected to, except so far as the description is concerned. In this respect, it is like the deed of Noah and Nathan Haines, and of Can by and wife. Four-fifths of the legal title, then, by *426 by these deeds, became vested in James T. Johnston. Before the title so vested, he had conveyed to Edward Barton, jr., with the usual covenants of warranty. Upon principles of established law it would be held, under ordinary circumstances, that this after acquired title would inure to the benefit of the prior grantee, and vest in Edward Barton, jr. a good title by the doctrine of estoppel. Johnston could not recover against him and defeat a title that he had covenanted to defend against all claims whatsoever; and, if he could not, neither can the plaintiffs’ lessors, claiming under subsequent deeds from him. We must, then, look to the arguments relied upon to exempt this case from the operation of the general rule. In the first place, it is said Johnston undertook to convey as the attorney of Haines’ heirs, and the warranty was made by mistake. The mistake consisted in this only: He supposed the. authority executed to him by the heirs of Haines, placed the title in him, and the dower estate of his wife being in him, that he had the power to vest in Barton, jr. a sufficient title in fee, and that his deed effected that object. He was mistaken in supposing that an invalid instrument was good for something — mistaken in the legal effect of his conveyance. He was under no mistake in supposing Barton- entitled to a good and sufficient warranty deed. This is shown by the title bond of .the elder Haines, .upon which full payment had then been made, and by-the direction of the elder Barton, to make the deed to his son. If the deed, thérefore, by operation of law, under the circumstances, passes the title and vests it in Barton the younger, it only 'carries into effect'the intention of the parties, including grantor, grantee and the owners of the legal as well as of the equitable title. The mistake, for- this reason, must be laid out ■ of view. Again, it is said that the doctrine of estoppel does not apply, because the after acquired title of.-James T. Johnston was received by him as trustee for the heirs of the elder Barton, and that the case is. within -the principle of the decision in Birchard v. Hubbard et al., 11 Ohio Rep. 316. Now, I admit, that after a contract of sale and the payment of the purchase money, *427 the holder of the legal title holds it as trustee for him who is entitled to the deed in fee. That person was Edward Barton, jr. The case in 11 Ohio Rep. is, also, admitted to be good law. But their application to the state of facts now before us is not so very palpable as plaintiffs’ lessor, in his argument, professes to believe. Barton, the elder, was the original contractor for the land; he purchased and paid for it, and, when his right to a deed was perfect, directed the conveyance to be made to the son, Barton, jr., and it was so made, in execution of the trust, by order of the cestui que trust. Now, in all soberness, wherein was there a violation of the trust ? Had not the real owner of the land a right to order the deed to be made to the son, or to any one else ? When his order or his request has been complied with, does it lie in his power or in the power of his heirs to complain that the trustee has violated the trust ? The heirs, and those claiming under them, could take no greater or other equitable or legal right than their ancestor proposed. He possessed none, for he had, in 1823, given up his bond for the use of his son. The statement of the proposition is sufficiently plain to show what must be the law of the case. It needs no other illustration.
The next objection shall be stated in the words of plaintiffs’ lessor:
“ If E. Barton, jr., obtained any interest, however small, un- ‘ der this deed, there is no estoppel.
“For the present argument, then, I assume that nothing £ passed to E. Barton, jr., under the deed from Johnston and ‘ wife to him. That deed is dated 30th of May, 1823. Under ‘ that, Edward Barton, jr., obtained no interest whatever in the £ land. On the 19th of June, 1824, Robert Haines made the £ deed to James T. Johnston. Here, then, for upwards of a £ year after the making of the deed, Edward Barton, jr., held ‘ no interest whatever in the land. The deed, during all that £ time, was inoperative as a conveyance. The proof is — and £ on this subject there is no dispute, and never has been — that *428 £ the deed was made to defraud the creditors of Edward Bar-* c ton, sen.
“ And the question now is, does the doctrine of estoppel apc ply so as that the law will give life and power to such a deed, £ by £perfecting ’ the title of the grantee, or 'will the law leave £ the parties where it found them ?”
To this point a vast number of authorities have been referred to and read. Without controverting the authority of any one of the cases, we will give a direct answer to the question here propounded; and one that is consistent with every case of sound law to be found in the books of reports, as well those cited, as others that might, have been. Wherever a conveyance has been made to defraud creditors, of either an equitable interest in lands or of a legal estate in lands, the law will leave the parties just where they have placed themselves. It will not permit either to be heard, to avoid the fraudulent act, by showing his own fraud; nor will it permit the heir to avoid the act of his ancestor, by proving the fraud of the ancestor, under whom he claims.
Let us apply the above principle to the facts of this case. The elder Barton fraudulently gave over his contract, by which he held an. equitable title, and caused Johnston to convey the land to his son, by warranty deed; whereas; if ho had been an honest man, and taken the conveyance to himself, he now would have had a good title, by operation of law. Johnston was not a party to the fraud. He did as he was directed; and what the father should have received, the son, by his fraudulent directions, took. The law leaves both where it found them, and operates upon their acts the same as if good faith and honesty had governed their conduct throughout the iniquitous transaction. By so doing we do not sanction the fraud; we merely prohibit the heirs from taking advantage of the sins of their ancestor. The fraud was directed against creditors; they are not before us. Were we to permit the fraud to defeat the estoppel, then we should be liable to the charge of having inter *429 fered in aid of one of the parties, but not otherwise. Another ground taken by plaintiffs’ lessor, is, that a fraudulent conveyanee is void, under our statute, as between the parties. It is admitted, in argument, that this point has repeatedly been ruled to the contrary. It may be due to the counsel to notice it, however. Suppose, as he contends, that the settled rule of construction encourages the fraudulent grantee to cheat his grantor; the answer is, that, as between the parties, the deed must be held valid, for a contrary rule would enable the fraud1ulent grantor to come into Court to establish his own crime, in avoidance of the deed. Against which practice, we have seldom seen a stronger array of authorities and argument, than has been furnished us in this very case by the plaintiffs’ lessor.
It only remains for us to consider the nature of the title, by possession. Edward Barton, sen., was placed on the land in 1817, in virtue of a contract, which was complied with by pay•ment. Since that time his possession, and the possession of those who have claimed under him, has never been tortious. In 1825 he caused the conveyance, before spoken of, to be made to his son, Edward, jr. While living he treated him as the owner, as having succeeded to all of his rights, and recognized him as the landlord, himself as the tenant. To all of his rights the heirs of Morris have succeeded. This makes for them a possessory title of upwards of twenty-one years, prior to 1843, upon the principles claimed on behalf of the plaintiffs’ lessor. For it is in proof that Edward, jr., was on the land, and that his father recognized him as the owner of whatever rights he once had under the Haines contract, from the day that J. T. Johnston executed, pursuant to his directions, the defective conveyance, in 1823. This was established on the trial at law, and by the decree dismissing the bill, which was filed to enjoin Morris’ judgment in the action of ejectment. Shall the naked legal title, now outstanding in the' heirs of Mary McKay, be allowed to defeat this long possession of the equitable owners, and of those under whom they claim, even if the statute, of limitations is not a bar ? We answer in the neg *430 ative. The possession taken under the title-bond was lawful, not tortious. Nothing has occurred to take away this right, which is in the heirs of Morris, and out of the plaintiffs7 lessors. They cannot recover upon a naked legal title, without a legal possessory right. To sustain this point the authorities cited are ample.
The plaintiffs7 lessors, however, claim that this last principle, properly applied to the facts before us, would entitle them to recover an undivided portion of the land in controversy, under the deeds from McKay’s heirs. We do not expect to be able, to convince them of their error at present; but in order that our view may be fairly understood, I make a brief restatement, which may enable them to see how far we go with them, and! to comprehend the points where, and the ground upon which we separate.
To this end we will examine, with some minuteness, thé extent of the equitable title held by the heirs of the elder Barton. He, in his lifetime, with a view to defraud his creditors, delivered over his contract, and directed a conveyance of the entire title, both legal and equitable, to be made to his son. This act bound him during life; though fraudulent as to creditors, it was good and binding between the parties. It said efficiently for him, I have transferred my equity in this land to my son ; and had he lived, he would never have been permitted to gainsay it. His residence upon the land afterwards, were there no other fact in the case, would be regarded as the occupancy of the son. As between the father and son, he must have been held the tenant of the son, occupying by his permission and sufferance, because this would be the result of such cionduct on their part, assuming that both acted honestly, and because the Court would not listen to proof offered by either to show that the transaction was fraudulent. As between the two Bartons, the father had done an act in his lifetime which estops both him and those holding under him as heirs, from denying that, at his death, all the equitable interest in the land was vested in the son. His heirs hold just as their ancestor *431 held, and can claim nothing which he could not have claimed. The deeds from the heirs of McKay,- passed to them nothing more than a naked legal title, subject to the equities arising under the contract, and the long continued possession of those entitled to that equity, or who in law.represented it. It is very evident that the plaintiffs’ lessor has been under a great mistake in the application of the facts to the law of his case. While he states the latter generally with much accuracy, there is a strange misapplication of the former. He even assumes that the plaintiffs’ lessor, claiming under the heirs of the elder Barton, held a title by adverse possession since 1823, the date of Johnston’s deed, up, to the time the heirs were ejected by Morris-under the deed from the younger Barton, in 1836; and throughout his argument upon this part of the case, overlooks entirely the fact that, in 1823, Edward Barton, senior, gave up his contract to Johnston, surrendered thereby the equity to his son, treated his son as the owner, and, supposing Johnston authorized to convey the legal title, directed him to convey to the son; that he did convey; and the son, to the time of the father’s death, refused to release or' reconvey; although he permitted the father to remain on the land while he lived. He also assumes that all the equitable title remained in Edward Barton, senior, after-his fraudulent surrender, and the conveyance made by his direction, while we hold that he cannot show a particle of equity without showing the fraud; and, as a mat-of law, counsel admit, that to permit him to do that would be grossly erroneous.
I have endeavored to make our views known. They are satisfactory to ourselves, and with that we must be content.

Judgment for Defendants.

N. B. — An application for new trial and reargument, was made by Mr. Jolliffe, which was overruled.