IN RE GUARDIANSHIP OF STEIN.

[Cite as *In re Guardianship of Stein,* 105 Ohio St.3d 30, 2004-Ohio-7114.]

*Probate courts – Guardianships – Parental rights – Probate court cannot empower guardian to withdraw life support from infant in persistent vegetative state without first properly terminating parental rights – Cause remanded to probate court to remove guardian's authority to withdraw life support.*

(No. 2004-0928 — Submitted October 26, 2004 — Decided December 30, 2004.)

APPEAL from the Court of Appeals for Summit County, No. 22092, 157 Ohio App.3d 417, 2004-Ohio-2948, 811 N.E.2d 594.

_____

**LUNDBERG STRATTON, J.**

{¶ 1}   Today this court must consider the narrow legal issue of whether the Summit County Probate Court exceeded its statutory authority when it appointed a guardian with the power to authorize the withdrawal of all life-sustaining support and treatment for Aiden Stein, an infant.  Although the unique facts of this case are tragic and raise many issues, this case does not require us to decide whether either of Aiden Stein's parents abused him or whether Aiden's father, appellant Matthew Stein, is guilty of any criminal charges.  It does not require us to decide whether it would be in Aiden's best interest to have life-supporting treatments withdrawn and comfort care administered or whether the constitutional rights of his parents were violated.  Rather, this case involves a narrow legal issue of statutory authority.

{¶ 2}   For the reasons that follow, we conclude that the probate court exceeded its statutory authority, and we, therefore, remand the cause to the Summit County Probate Court to amend the guardianship order to remove the

portion of the order authorizing the guardian to withdraw life-supporting treatment for Aiden.

History

{¶ 3}   On March 15, 2004, five-month-old Aiden Stein was taken from his home to MedCentral Hospital, Mansfield, in Richland County by emergency transport.  When Aiden arrived at MedCentral, he was in critical condition, not moving, and unable to breathe on his own.  He was placed on a mechanical ventilator, resuscitated, and transferred to Akron Children's Hospital Medical Center of Akron in Summit County.

{¶ 4}   Upon arrival at Children's Hospital, Aiden was found to have excessive amounts of blood on his brain.  He was moved to the critical care unit, where doctors attempted to drain some of the excess blood from his head.  In the emergency department, Aiden was diagnosed as having suffered a traumatic brain injury.

{¶ 5}   Dr. Richard D. Steiner, D.O., an attending physician in the emergency department at Children's Hospital, was called to evaluate Aiden soon after his arrival.  Dr. Steiner testified that because of the child's age, there was a suspicion by the emergency room physicians that Aiden may have suffered the injury as a result of abuse.

{¶ 6}   Aiden's sole caretaker on the day he sustained these injuries was his father, Matthew Stein ("Stein").  In addition, there was evidence of a possible prior incident of abuse, regarding which neither parent could be ruled out as a suspect.  On March 16, 2004, appellee Richland County Children Services Board ("RCCSB") was granted emergency temporary custody  of Aiden based upon the above diagnosis and allegations that the injuries were inflicted by Stein, with whom Aiden's mother, appellant Arica Heimlich, was residing.

{¶ 7}   Aiden's prognosis, based on a reasonable degree of medical certainty, is that he will have no awareness of or ability to interact with his

environment other than reflexive actions. Three of four doctors who testified at the hearing opined that, at best, Aiden's outcome would be a permanent unconscious state, also described as a persistent vegetative state.

{¶ 8} Due to Aiden's diagnosis and prognosis, the Children's Hospital Ethics Committee was consulted regarding ethical issues involved in continuing, limiting, or withdrawing life-supporting treatment for Aiden. The ethics committee is a multidisciplinary group of people, including physicians, nurses, therapists, community members, clergy, and legal counsel, and is not associated with the hospital. Because Stein was under suspicion of causing Aiden's injuries, and because Heimlich remained allied with Stein after the alleged abuse, the committee recommended that due to the significant potential for a conflict of interest, a guardian should be appointed to help make medical decisions for Aiden. In addition, the ethics committee recommended that life-supporting treatment be withdrawn and comfort care be administered to Aiden.

{¶ 9} On April 6, 2004, at the request of Children's Hospital, appellee Ellen Kaforey applied to the Summit County Probate Court for appointment as Aiden's guardian "to evaluate and determine the withdrawal of life-sustaining medical treatment currently being administered" to Aiden. Kaforey is an attorney and a registered nurse who is often called upon by the probate court to assist families in cases where medical decisions need to be made for a family member.

{¶ 10} The Summit County Probate Court held an evidentiary hearing on Kaforey's application on April 14, 16, 21, and 22, 2004. At the hearing, testimony was taken from Aiden's parents, Stein and Heimlich, Dr. John Pope, Ellen Kaforey, Michelle Renee Flaherty (an investigator for RCCSB), Dr. Richard Steiner, Janet Roberts (a licensed practical nurse), Leanne Sessler (sister of Arica Heimlich), Dr. Max Wiznitzer, and Dr. Paul A. Byrne.

{¶ 11} Dr. John Pope, a pediatrician and critical care pediatric specialist at Children's Hospital, testified that Aiden's condition was consistent with shaken

baby syndrome. He testified that Aiden had "tremendous intracranial injuries inside of his skull, blood around his brain, as well as significant evidence on [the] CT of injury to the brain itself, and also had a significant amount of bleeding in the back of his eyes or retinal hemorrhages. These injuries without a history of an immediately preceding significant traumatic event are only consistent with shaken baby syndrome."

{¶ 12} Dr. Pope testified that Aiden "not only suffered from the bleeding and the direct traumatic injury, but the brain, his upper brain, the cortex, the parts of the brain that makes us who we are, suffered for some period of time [from] inadequate oxygen and inadequate blood flow."

{¶ 13} Further, Dr. Pope testified that Aiden's most recent CAT scan at that time, which was March 22, "showed that part of the brain to be essentially completely black which is an indication that that part of the brain is dead." A subsequent x-ray showed that Aiden also had a fractured skull, which Dr. Pope testified was consistent with a "discard injury," occurring when a victim of shaken baby syndrome is tossed aside after having been shaken. Dr. Pope testified that Aiden was the victim of shaken infant syndrome and that he will remain in a persistent vegetative state until he dies.

{¶ 14} Dr. Steiner, attending physician at Children's Hospital Department of Emergency Medicine, testified that Aiden was the victim of shaken infant syndrome, and he concurred with Dr. Pope's prognosis that Aiden will remain in a persistent vegetative state until he dies.

{¶ 15} Dr. Max Wiznitzer, appointed by the court as an independent medical reviewer, is on staff at Rainbow Babies and Children's Hospital, Department of Pediatrics, and at University Hospitals of Cleveland, Department of Neurology. Dr. Wiznitzer testified that Aiden was the victim of shaken infant syndrome and that he will remain in a persistent vegetative state until he dies.

**{¶ 16}** Dr. Paul Byrne testified on behalf of Aiden's parents. Dr. Byrne testified that he had examined Aiden and reviewed the file and concluded that Aiden's injuries were not caused by shaken infant syndrome. Rather, Dr. Byrne testified that Aiden had a preexisting condition and that an unspecified acute event sent him into respiratory arrest. He testified that the withdrawal of life-sustaining medical treatment was not appropriate. When asked whether there are any circumstances where the withdrawal of life-sustaining medical treatment is ethically appropriate, Dr. Byrne responded, "Let's put it this way, I haven't seen that."

**{¶ 17}** On the second day of the hearing, the parties reached an agreement that the court could move forward to appoint Ellen Kaforey as the guardian of Aiden Stein for limited purposes, defined to include making all medical decisions with the exception of the withdrawal of life-sustaining treatments, for Aiden Stein from that point forward until further order of the court.

**{¶ 18}** Following the hearing, on April 29, 2004, the probate court appointed Ellen Kaforey as "limited guardian" of Aiden Stein, but, despite the agreement, ordered that her powers include (1) giving consent to all medical treatment, (2) withdrawing all life-sustaining support and treatment, (3) requesting a do-not-resuscitate order, (4) directing the infant's medical care providers to cease all medical treatment that would prolong the life of the infant, and (5) making recommendations regarding Aiden's eventual disposition if he requires posthospital care elsewhere.

**{¶ 19}** R.C. 2133.08 authorizes the removal of life-sustaining treatment for terminally ill adults. However, the probate court concluded that R.C. 2133.08 "arguably" does not apply to minors, and, therefore, the court instead derived its authority from R.C. 2111.06, a general statute that authorizes the probate court to appoint a guardian to make medical and other decisions for a minor if the parents are unsuitable.

**{¶ 20}** The Summit County Court of Appeals affirmed the judgment of the probate court on June 9, 2004. *In re Guardianship of Stein*, 157 Ohio App.3d 417, 2004-Ohio-2948, 811 N.E.2d 594. This court granted the appellant parents' motion to stay execution of the court of appeals' judgment on June 11, 2004. *In re Guardianship of Stein*, 102 Ohio St.3d 1475, 2004-Ohio-2995, 810 N.E.2d 441.

**{¶ 21}** This cause is now before us upon our acceptance of a discretionary appeal.

Jurisdiction

**{¶ 22}** R.C. 2101.24(A)(1) defines the jurisdiction of the probate court, providing that:

**{¶ 23}** "Except as otherwise provided by law, the probate court has exclusive jurisdiction:

**{¶ 24}** " * * *

**{¶ 25}** "(e) To appoint and remove guardians * * *."

**{¶ 26}** The probate court concluded that Aiden is a resident of Summit County as required by R.C. 2111.02(A), a conclusion with which we agree. A minor's resident status is to be construed consistently with the best interest of the minor. See *In re Fore* (1958), 168 Ohio St. 363, 369, 7 O.O.2d 127,155 N.E.2d 194. Further, "residence" refers to a place of dwelling within the state. Id. at 371, 7 O.O.2d 127, 155 N.E.2d 194. Since being admitted to Akron Children's Hospital on March 15, 2004, Aiden has been residing in Summit County on a 24-hour, seven-day-per-week basis. Moreover, the parties do not appear to contest the probate court's finding of residency or of jurisdiction. We, therefore, hold that Aiden is a resident of Summit County for purposes of this case under R.C. 2111.02(A), and the probate court had jurisdiction to consider these questions.

Guardianship

**{¶ 27}** "[A] parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that

'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " *Lassiter v. Dept. of Social Serv.* (1981), 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640, quoting *Stanley v. Illinois* (1971), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551.

{¶ 28} Ellen Kaforey filed for guardianship of Aiden Stein after the Ethics Committee at Akron Children's Hospital concluded that Aiden's parents have a conflict of interest regarding Aiden's care due to the potential for enhanced criminal charges if Aiden dies. R.C. 2111.06 provides that "[a] guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor."

{¶ 29} The probate court granted that application and granted to Kaforey the authority to withdraw life-supporting treatments for Aiden. Stein and Heimlich contend that any decision to remove life-supporting treatment from Aiden would have the effect of terminating their parental rights without due process. The RCCSB and Guardian Kaforey argue that if life-supporting treatments are withdrawn and Aiden dies, it would be the neurological injuries Aiden sustained that would be the cause of death, not the act of withdrawing the life-supporting treatments.

{¶ 30} R.C. 2133.08, part of Ohio's version of the Uniform Rights of the Terminally Ill Act, is the only Ohio statute that explicitly authorizes the removal of life-sustaining treatment. The statute, by its very terms, however, applies only to adults. R.C. 2133.08(A)(1). If a statute is unambiguous, we must apply it as written. *State v. Hairston, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 13.* See, also, *State v. Hughes (1999), 86 Ohio St.3d 424, 427, 715 N.E.2d 540* ("In construing a statute, we may not add or delete words"). If the General Assembly wanted to apply R.C. 2133.08 to minors, it could have expressly done so. Because it has not, we will not extend the statute's application by judicial

decree. Thus, the probate court correctly concluded that R.C. 2133.08 does not permit the withdrawal of life-sustaining treatment for a minor.

{¶ 31} The probate court then turned to R.C. Chapter 2111, concerning guardianships and conservatorships. Specifically, R.C. 2111.50(F) provides that "[w]hen considering any question related to, and issuing orders for, medical or surgical care or treatment of incompetents or minors subject to guardianship, the probate court has full parens patria powers unless otherwise provided by a section of the Revised Code." Moreover, R.C. 2111.06 provides that "[a] guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor."

{¶ 32} Aiden's parents have been considered unsuitable due to the conflict of interest that exists in this case, namely, if life-supporting treatments are withdrawn, Aiden will die, and if Aiden dies, his father, who was the sole caretaker on the day Aiden sustained his injuries, could be charged with murder, as he is suspected of injuring the baby. Further, Aiden's mother, Heimlich, who resides with and has since become engaged to Stein, does not believe that Stein caused Aiden's injuries, and neither can be ruled out as having caused a possible prior incident of abuse.

{¶ 33} In accordance with R.C. 2111.06, the probate court in this instance concluded that it had the jurisdiction to appoint a guardian for the purpose of making or recommending medical decisions for Aiden, including life-and-death issues of removing life-sustaining treatments. We find, however, that the decision to withdraw life-supporting treatments goes beyond the scope of making medical decisions.

{¶ 34} The Richland County Juvenile Court placed Aiden in the emergency temporary protective custody of the RCCSB on March 16, 2004. On October 26, 2004, at the time this court heard this case on the merits, permanent

custody of Aiden had not been determined, and he remained in the temporary custody of the RCCSB.

{¶ 35} In this case, the parents' rights have been merely suspended, not terminated. We acknowledge the argument that the abuse would be the true proximate cause of Aiden's death should life-supporting treatments be withdrawn. However, many scenarios are possible in this unique case, such as the possibility that Heimlich could choose to leave Stein and seek sole custody of Aiden. If it cannot be established that she participated in any of the possible instances of abuse, there may not be grounds to deny her reunification with her son. The fact that a child is in a permanent vegetative state is not a sufficient reason to deny parental rights, absent evidence of abuse or neglect. The right to withdraw life-supporting treatment for a child remains with the child's parents until the parents' rights are permanently terminated.

{¶ 36} "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky v. Kramer* (1982), 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599.

{¶ 37} We conclude that the probate court's order authorizing the guardian to withdraw life-supporting treatments has the effect of terminating parental rights. We, therefore, hold that the probate court exceeded its statutory authority in granting the guardian the power to withdraw life-supporting treatments before the parents' rights were permanently terminated. If the

Richland County Juvenile Court permanently terminates the parental rights of Stein and Heimlich, the guardian will then fully stand in the shoes of the parents. Until then, the granting of authority to withdraw life-supporting treatment for Aiden is premature.

{¶ 38} The heartbreak and tragedy in this case cannot be overstated. However, we believe that without a full and proper adjudication of parental rights concluding in a termination of those rights, a probate court has no authority to allow a guardian to make a decision that will terminate the life of a child, when parental rights have not been permanently terminated, thereby terminating the parent-child relationship. Accordingly, because the parties have otherwise stipulated to the order of the Summit County Probate Court, we remand the cause to the Summit County Probate Court to amend the guardianship order to remove the portion of the order authorizing the guardian to withdraw life-supporting treatments for Aiden.

Judgment reversed

and cause remanded.

RESNICK and F.E. SWEENEY, JJ., concur.

O'DONNELL, J., concurs separately.

MOYER, C.J., concurs in part and dissents in part.

PFEIFER, J., concurs in part and dissents in part.

O'CONNOR, J., dissents.

_____

**O'DONNELL, J., concurring.**

{¶ 39} The majority has correctly concluded that the judgment of the court of appeals should be reversed; I write separately to emphasize the fact that the Richland County Juvenile Court had exercised jurisdiction over Aiden Stein, had not terminated parental rights, and in my view, never relinquished its jurisdiction over the custody of the infant.

{¶ 40} Against that factual background, after the infant was transported to Akron Children's Hospital in Summit County and at the request of the hospital, Ellen Kaforey, an attorney and a nurse, applied to the probate court to serve as guardian for the infant.

{¶ 41} The parties consented to her appointment, but not to her authority to withdraw life support; despite the agreement, the Summit County Probate Court granted her that authority.

{¶ 42} Two questions arise: one, which court should be acting on the infant's behalf, and two, does the statute authorize a probate court to terminate life support of a minor? The answer to the first question is that the Richland County Juvenile Court has jurisdiction over this child and the answer to the second is that the legislature has not provided authority to a probate court to exercise this jurisdiction. Decisions of this kind involving minors are properly left to parents. Unless or until their rights as to their child are terminated, they are the proper parties to make the decision with respect to their own child.

{¶ 43} I do not agree that a guardian is in a position to make decisions regarding the termination of life support for Aiden if the Richland County Juvenile Court does terminate parental rights. Juvenile courts of our state must consider the best interest of the child in making custody decisions and must place custody of the child with the party best suited to provide care. See, generally, R.C. 2151.353 and 2151.414.

{¶ 44} The General Assembly recognized the role of parents and the duty of courts to defer to the decisions of parents or those who exercise parental rights and, in enacting R.C. 2133.08 regarding the rights of the terminally ill, specifically chose to extend application only to adults, and not to minors.

{¶ 45} Therefore, in my view, the Summit County Probate Court abused its discretion in authorizing the guardian to terminate life support for Aiden Stein. Accordingly, I concur with the majority in its decision to order the Summit

County Probate Court to amend its judgment deleting the authority to withdraw life support, because that is not authorized by R.C. 2133.08, but I would also remand the matter to the Richland County Juvenile Court for further proceedings regarding the adjudication of parental rights.

_____

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 46} We live in a technological age in which the dividing line between life and death is sometimes a fine one. Aiden Stein "lives" because his heart is beating and his body is capable of sustaining itself when provided nutrition, water, and technological assistance. We are told that every area of his brain, however, has been significantly damaged except for the "very deep center of the brain stem which is the very primitive area of the brain." The clear consensus of medical opinion is that Aiden's ability to relate to people and events around him no longer exists—and will never return. He is described as being in a persistent vegetative state with no chance for recovery. The trial court described Aiden's existence as "not life but a cruel shadow of life."

{¶ 47} Ethical people of good will disagree as to what is in the best interest of a person under such circumstances. I agree with the majority that the ultimate inquiry before us is not whether life-supporting treatment should be continued. Rather, the ultimate question we must resolve is whether Aiden's parents retain the legal right to make that decision, even though one parent is suspected of (but not charged with) causing Aiden's injuries and the other believes in the father's innocence. Or did the state, acting through the probate court and in light of the accusations against one or both of Aiden's parents, validly vest a guardian with the limited authority to make the decision whether life-supporting treatment should be continued? The issue is Solomonic.

{¶ 48} As does the majority, I acknowledge that the right of natural parents to direct the care and upbringing of a child is a fundamental liberty

interest of constitutional dimension. *Troxel v. Granville* (2000), 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49. However, that authority is not unlimited. The state clearly has parens patriae power over minors in certain circumstances.

**{¶ 49}** Ohio courts do not, however, have inherent jurisdiction to determine a child's best interests, as they possess only the jurisdiction that the General Assembly has expressly conferred upon them. See Section 4(B), Article IV of the Ohio Constitution; *Seventh Urban, Inc. v. Univ. Circle Property Dev., Inc.* (1981), 67 Ohio St.2d 19, 22, 21 O.O.3d 12, 423 N.E.2d 1070. Thus the question remains whether Ohio's statutory scheme grants the trial court the authority to terminate Aiden's life support contrary to the will of his parents.

**{¶ 50}** The trial court proceeded under the authority of R.C. 2111.02 and 2111.06. R.C. 2111.02 states:

**{¶ 51}** "(A) When *found necessary*, the probate court * * * shall appoint * * * a guardian of the person, the estate, or both, of a minor * * *.

**{¶ 52}** " * * *

**{¶ 53}** "(B)(1) If the probate court *finds it to be in the best interest of [a] * * * minor*, it may appoint * * * on its own motion or on application by an interested party, a limited guardian with specific limited powers. * * * [T]he order of appointment and letters of authority of a limited guardian shall state the reasons for, and specify the limited powers of, the guardian. The court may appoint a limited guardian for a definite or indefinite period. * * *

**{¶ 54}** "(C) Prior to the appointment of a * * * limited guardian under division (A) or (B)(1) of this section, the court shall conduct a hearing on the matter of the appointment." (Emphasis added.)

**{¶ 55}** R.C. 2111.06 provides:

**{¶ 56}** "A guardian of the person of a minor shall be appointed as to a minor having neither father nor mother, *or whose parents are unsuitable persons to have the custody and tuition of such minor, or whose interests, in the opinion of*

*the court, will be promoted thereby.* A guardian of the person shall have the custody and provide for the maintenance of the ward, and if the ward is a minor such guardian shall also provide for the education of such ward." (Emphasis added.)

{¶ 57} R.C. 2111.02 and 2111.06 vest the probate courts of Ohio with broad power. Upon a mere finding that it is in the "best interest of a * * * minor," R.C. 2111.02(B)(1) authorizes a probate court to supplant a parent's rights and responsibilities through appointment of a limited guardian. Similarly, R.C. 2111.06 authorizes a probate court to appoint a guardian of a minor not only where the court finds the child's natural parents to be "unsuitable persons" but also upon the mere finding that the child's "interests * * * will be promoted thereby."

{¶ 58} These conclusory statutory criteria stand in stark contrast to the comprehensive statutory scheme set forth in R.C. Chapter 2151 governing the adjudication of children as dependent, neglected, or abused, and ultimately, the permanent termination of a natural parent's legal rights. Indeed, where parents are believed to be unfit, R.C. Chapter 2151 is more commonly invoked to accomplish transfer of responsibility for children from natural parents to the state than is the probate code.

{¶ 59} Nevertheless, R.C. 2111.02 clearly authorizes a probate court to appoint a limited guardian where the court finds it to be in the child's best interests to do so. Nothing in the text of the statute precludes the court from authorizing a limited guardian to direct a child's medical provider to terminate life support.

{¶ 60} I do not accept the majority's premise that a decision to withdraw life-supporting treatments is something other than a medical decision. Nor do I believe that a decision to withdraw life-supporting treatments is equivalent to the termination of the parent-child relationship. That relationship is legal in nature,

14

and while the death of either clearly changes it, the relationship survives death. See, for example, the statute of descent and distribution, R.C. 2105.06(F), providing that a surviving parent is entitled to inherit from the estate of a deceased child not survived by a spouse or his or her own children.

{¶ 61} In short, I believe that the General Assembly has authorized probate courts to enter orders like that made by the Probate Court of Summit County.

{¶ 62} I believe that the question whether R.C. 2111.02 and 2111.06 were constitutionally applied to Aiden's parents is a separate, serious, and legitimate one. The court of appeals refused to address it, observing that the parents first raised constitutional objections "during their closing argument at the conclusion of a four-day hearing, when it was clearly too late for the trial court to correct the alleged error."

{¶ 63} I disagree. It is true that counsel's advocacy was less than artful and that he did not specifically argue that application of the  guardianship statutes to Aiden's parents would be unconstitutional. I cannot subscribe to the premise, however, that constitutional issues were waived because not raised "at a time when such error could have been avoided or corrected by the trial court." *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 64} Counsel for Aiden's parents stated at closing argument:

{¶ 65} "The issue in this case is not merely jurisdiction * * *.  This court's primary jurisdiction over guardianship, your Honor, is a mere footnote to the fundamental interest in life, liberty and property which is the core constitutional issue in this case.

{¶ 66} " * * *

{¶ 67} "This constitutional issue is — partakes of the First Amendment, your Honor, the associative right of the parent, the Fifth Amendment in the

depravation [sic] of a human life, and most particularly the Fourteenth Amendment through the state's participation through the person of this honorable court in making this decision. And, your Honor, I do not question the jurisdiction of the Court, I simply request that the fundamental due process to be accorded my clients be permitted to proceed just as this application for a best interest substitute of judgment has been permitted to proceed.

**{¶ 68}** " * * *

**{¶ 69}** "And respectfully, your Honor, * * * I'm asking this Court to reconsider its own opinion in [a prior analogous case] and that's because of the constitutional issues presented * * *.

**{¶ 70}** " * * *

**{¶ 71}** "My clients have * * * not been permitted their procedural due process and substantive due process rights before the state of Ohio."

**{¶ 72}** In my view, these comments adequately preserved constitutional issues for appellate review. The trial court clearly was put on notice that Aiden's parents believed that their constitutional rights were in jeopardy before the trial court granted the guardianship application. The fact that the written trial court decision granting the guardianship did not address these issues does not mean that they were not raised. Nor did they waive their constitutional rights by stipulating that a guardian would be appointed to make medical decisions not involving the termination of life support. I note, moreover, that "[e]ven where waiver is clear, this court reserves the right to consider constitutional challenges to the application of statutes in specific cases of plain error or *where the rights and interests involved may warrant it*." (Emphasis added.) *In re M.D.* (1988), 38 Ohio St.3d 149, 527 N.E.2d 286, at syllabus (reviewing the constitutionality of a statute as applied even though the constitutional challenge was presented at the trial court "in general terms"). Id. at 151, 527 N.E.2d 286.

**{¶ 73}** In *Troxel*, the Supreme Court of the United States reviewed a Washington visitation statute invoked by grandparents Jenifer and Gary Troxel. The statute permitted "'[a]ny person' to petition a superior court for visitation rights 'at any time,' and authorize[d] that court to grant such visitation rights whenever 'visitation may serve the best interest of the child.' " Id., 530 U.S. at 60, 120 S.Ct. 2054, 147 L.Ed.2d 49. The children's mother did not object to a grant of some visitation, but asked the court to order only one day of visitation per month, with no overnight stay. The superior court, however, entered a visitation order allowing the grandparents more extensive visitation based on its conclusion that more extensive visitation was in the children's best interests.

**{¶ 74}** Justice O'Connor of the Supreme Court of the United States concluded, in a plurality opinion, that, as applied, the "breathtakingly broad" Washington statute exceeded the bounds of the Due Process Clause. Id. at 67, 120 S.Ct. 2054, 147 L.Ed.2d 49. She concluded that the Washington trial court had "directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child," and specifically noted that the grandparents "did not allege, and no court has found, that [the mother] was an unfit parent." Id. at 69 and 68, 120 S.Ct. 2054, 147 L.Ed.2d 49. The latter aspect of the case was characterized as "important." Id. at 68, 120 S.Ct. 2054, 147 L.Ed.2d 49.

**{¶ 75}** Notably, in the case at bar, allegations of unfitness have been made against one, if not both, of Aiden's parents. The trial court did not, however, find that either parent was responsible for Aiden's injuries, only that they *may* have been responsible.[1]

---

1. **{¶a}** The trial court appointed a limited guardian based on the following reasoning:

  **{¶b}** "Matthew Stein *has allegedly abused* Aiden Stein \*\*\*. Matthew Stein *is the subject of a criminal investigation* related to the infliction of Aiden's current injuries *and will undoubtedly be charged* with homicide or negligent homicide if Aiden is allowed to die from the underlying cause of his condition. Further, the mother, Arica, supports the father's assertion that he is not to blame for the current injuries. Additionally, there is evidence that Aiden Stein has suffered prior brain bleeds consistent with nonaccidental trauma. Neither Arica Heimlich or Matthew Stein *can be*

{¶ 76} After *Troxel* it is unclear whether, and under what circumstances, a state may constitutionally override a fit parent's decision as to the care or upbringing of a child based on the state's disagreement with the parent's conclusion as to a child's best interests. ("Our cases, it is true, have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child." Id. 530 U.S. at 78, 120 S.Ct. 2054, 147 L.Ed.2d 49 [Souter, J., concurring in judgment].) It seems clear, however, that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made," id. at 72-73, 120 S.Ct. 2054, 147 L.Ed.2d 49, and that a court must accord "special weight" to a fit parent's determination of the child's best interests, id. at 70, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 77} It is not overly dramatic to observe that this case presents a life-and-death issue and implicates one of our society's most precious and fundamental interests—the rights of parents in their relationship with their children. For this reason I believe that this cause should be reversed and remanded to the court of appeals with instructions that it consider the constitutional implications of the actions of the trial court.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 78} I concur with the majority's holding ordering the probate court to terminate the guardian's authority to withdraw life support, but for a different reason. I believe that the probate court lacked jurisdiction to grant any authority at all to the guardian in this case. I cannot agree that Aiden's hospitalization for

---

*ruled out as suspects* in the prior injury or injuries that Aiden has suffered. Therefore, Arica Heimlich and Matthew Stein are in a position of a conflict of interest and are unsuitable such that this Court in its role as parens patriae has a duty to act in the best interest of Aiden Stein and appoint a neutral third party as limited guardian to make medical decisions on his behalf." (Emphasis added.)

less than one month before the first hearing in Summit County gave jurisdiction to the probate court of that county. Pursuant to R.C. 2111.02(A), the person for whom a guardian is appointed must be "a resident of the county or [have] a legal settlement in the county." We set a dangerous precedent when we hold that hospitalization establishes settlement for purposes of probate court jurisdiction. That holding will affect not just babies, but people at the other end of life. Elderly citizens with substantial assets could become victims of people with less than admirable economic motives trying to establish guardianship outside the ward's home county.

{¶ 79} Here, Aiden's fate should be decided in Richland County. Ohioans do not abandon their homes just by being in the hospital somewhere else.

———————————

**O'CONNOR, J., dissenting.**

{¶ 80} Because the majority focuses its attention on two chapters of the Revised Code that are immaterial to this case (Chapters 2133 and 2151) and relies heavily on public policy arguments to usurp the legislative grant of authority to the probate court, I must respectfully dissent.

{¶ 81} The majority gives precedence to the rights of the parents over the best interests of the child by reversing the judgment of the court of appeals. In the initial part of the opinion, the majority claims that this case solely involves the "narrow legal issue of whether the Summit County Probate Court exceeded its statutory authority." It further correctly states that this case "does not require us to decide whether it would be in Aiden's best interest to have life-supporting treatments withdrawn and comfort care administered or whether the constitutional rights of his parents were violated."

{¶ 82} Yet, when addressing the topic of guardianship, the majority states, " '[A] parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably

warrants deference and, absent a powerful countervailing interest, protection," ' " quoting *Lassiter v. Dept. of Social Servs.* (1981), 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640, and *Stanley v. Illinois* (1971), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Later, the majority reiterates its focus on the fundamental rights of the parent when citing *Santosky v. Kramer* (1982), 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599, which addresses the parents' fundamental rights in the care, custody, and management of their children and the provision of fundamentally fair procedures when the state moves to intervene. This is a discussion of the very parental constitutional right the majority declared irrelevant.

**{¶ 83}** It is fundamental that R.C. 2133.08 applies only to adults and therefore its dictates have no relevance to the case at hand. The bill that enacted this statute also modified the Durable Power of Attorney for Health Care Act, R.C. 1337.11 et seq., and stated, "The General Assembly declares that its several intents in enacting Amended Substitute Senate Bill No. 13 of the 118th General Assembly [the bill that first enacted the Durable Power for Health Care Act] did not include any intent to affect the ability of competent adults or *the guardians of* incompetents or *minors* to make informed health care decisions for themselves or their wards." (Emphasis added.) Section 5 of Am.Sub.S.B. No. 1, 144 Ohio Laws, Part I, 64. R.C. Chapter 2133 establishes Ohio's do-not-resuscitate law for adults and complements the durable power of attorney for health care. Each expressly applies only to adults. R.C. 1337.12(A)(1); 2133.08(A)(1). Both involve end-of-life care for adults. The General Assembly expressly stated when enacting R.C. Chapter 2133 that provisions relating to terminally ill adults do not affect the ability of the guardian of a minor to make informed medical decisions. Aiden is an infant. Accordingly, R.C. 2133.08 does not affect this case.

**{¶ 84}** The essence of this probate case is that the actions of the parents necessitated the appointment of a guardian. R.C. 2111.06 provides that "[a]

guardian of the person of a minor shall be appointed as to a minor * * * whose parents are unsuitable persons to have the custody and tuition of such minor." The nature of the injuries to Aiden and the circumstances stated in the majority opinion clearly support the probate court's finding that the parents are "unsuitable persons."

{¶ 85} R.C. 2111.50(F) unquestionably authorizes the probate court to make decisions regarding "medical or surgical care or treatment of incompetents or minors subject to guardianship, [for] the probate court has full parens patriae powers unless otherwise provided by a section of the Revised Code." The decision to remove life-sustaining measures is such a decision. See *In re Guardianship of Crum* (1991), 61 Ohio Misc.2d 596, 580 N.E.2d 876 (probate court has power under R.C. 2111.50 to authorize guardian of a minor to refuse or terminate life-sustaining care of ward).

{¶ 86} The majority interjects a layer of procedure that is not mandated by the legislature. It is not a prerequisite that the parents' rights be terminated before the probate court can act. The termination of parental rights is governed by R.C. Chapter 2151 and is wholly independent of the appointment of a guardian. Parental rights cases are adjudicated by juvenile courts. See, e.g., R.C. 2151.414. Adjudicating the necessity of a guardianship is the province of probate courts. See R.C. 2111.06. While in the case of a minor, the powers of the courts may overlap, the two courts serve different roles. A probate court may appoint a guardian over decisions of the person and the estate where the parents are "unsuitable" to serve as guardian. R.C. 2111.06. The probate court also has the power to appoint a limited guardian where it serves the best interest of the ward and where only certain aspects of the ward's person or estate need to be safeguarded. See R.C. 2111.02(B)(1). In contrast, a juvenile court may terminate parental rights where a child is abused, dependent, or neglected. R.C. 2151.353. The role of the juvenile court then is to appoint a person or entity to raise the child

in a suitable environment. Id. A juvenile court's decision may result in temporary custody or permanent custody, but it cannot be fragmentary. Disputes arising from the overlapping power of the courts are not new. See *Hoffman v. Hoffman* (1864), 15 Ohio St. 427, 1864 WL 51 (a probate court cannot by letters of guardianship interfere with a child custody adjudication of another court). Juvenile courts are equally bound by prior probate rulings. *In re Miller* (1986), 33 Ohio App.3d 224, 515 N.E.2d 635 (where a probate court appoints a guardian for a minor child, the probate court retains continuing and exclusive jurisdiction over the ward and the guardian; thus, a juvenile court is without jurisdiction to grant custody of the ward to another person until the guardianship has been terminated). Here, the mother and father consented, in effect, to the Richland County Juvenile Court's finding that Aiden was a "dependent/abused" child and the grant of temporary custody of Aiden to Richland County Children Services Board ("RCCSB").[2] According to the court below, RCCSB moved for an order to withdraw life-sustaining treatment from Aiden, and the juvenile court responded by ordering, "All decisions regarding medical care for Aiden Hemlich [sic], minor child, shall be made jointly by [RCCSB] and the child's parents, upon the advice of the child's physicians." However, the juvenile court stated that a court of competent jurisdiction could supersede the medical authority granted by it. Thus, the juvenile court found that it is without jurisdiction over this case because it lacks authority to grant the requested relief. This is a guardianship case. Jurisdiction was properly in the hands of the probate court.

{¶ 87} The crux of the majority's argument that the probate court lacked the authority to permit the guardian to withdraw life-supporting treatment is a statement that this decision is not a medical one. The finding that the withdrawal of life-supporting treatment goes beyond the scope of a medical decision is stated

---

2. RCCSB is a party to this case and is aligned with the appellees.

without any support whatsoever.  To the contrary, the decision that a child-patient has permanently lost high-level brain function and should be allowed to die is a decision relating to medical care or treatment, and as such must be made with the best interests of the child-patient foremost in mind. See *In re Guardianship of Myers* (1993), 62 Ohio Misc.2d 763, 773, 610 N.E.2d 663; *In re Guardianship of Crum* (1991), 61 Ohio Misc.2d 596, 580 N.E.2d 876; 77 Corpus Juris Secundum (1994) 552, Right to Die, Section 5.  The act of withdrawing life-support mechanisms and administering comfort care will permit Aiden to die, not from an overt act of the medical professionals but from the natural consequences of the severe injuries inflicted upon this child.  The majority acknowledges as much.

{¶ 88} The overwhelming medical expert testimony agreed on the nature of the injuries, the manner in which they were inflicted, and the prognosis for the child.  The probate court and the guardian acted within the powers granted them under R.C. 2111.50 when they decided to withdraw life-sustaining treatment from Aiden.

{¶ 89} The majority concludes, "The fact that a child is in a permanent vegetative state is not sufficient reason to deny parental rights, absent evidence of abuse or neglect.  The right to withdraw life-supporting treatment for a child remains with the child's parents until the rights are permanently terminated." As previously discussed, this appeal did not emanate from proceedings in juvenile court.  A discussion of parental rights is misplaced.

{¶ 90} The issue we are presented with is whether the probate court abused its discretion under R.C. Chapter 2111. Here the probate court was faced with overwhelming evidence of severe physical abuse by one parent and the other parent's allegiance to the alleged abusing parent.  The evidence supporting the proposition that the father caused Aiden's injury is sufficient to find the father unfit.  The mother's ability to decide what is in Aiden's best interest has been hopelessly compromised by her knowledge that when Aiden dies, the father will

be charged with murder. Her conflict of interest is glaringly obvious. A conflict of interest may justify the appointment of a guardian. *In re Guardianship of Muehrcke*, Cuyahoga App. No. 81353, 2003-Ohio-176, 2003 WL 132422. Unfortunately, the majority imagines future scenarios that are irrelevant to the case at hand. To presume that Aiden's mother will suddenly change course to do anything but support the father and align with what she perceives as best for Aiden is ludicrous. The probate court, following a finding that the parents are unsuitable, stands in the shoes of the parents. That is all that is required when decisions, including medical decisions, have to be made for children whose parents are not suitable to do so.

{¶ 91} The conclusion that withdrawing life support would be the functional equivalent of a permanent termination of parental rights again focuses on the unnecessary. As discussed above, the probate court has the statutory authority to appoint a guardian for the purpose it did in this case. The majority concedes this point but reasons that until parental rights are terminated, the appointment of a guardian with "authority to withdraw life-supporting treatment for Aiden is premature." The only provision in the Revised Code that can be read to grant authority to appoint such a guardian over a child is R.C. 2111.50. So the majority must agree that the probate court is the court to exercise such authority.

{¶ 92} The majority finds this authority limited by the United States Supreme Court's pronouncement, " 'When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures,' " quoting *Santosky v. Kramer*, 455 U.S. at 754, 102 S.Ct. 1388, 71 L.Ed.2d 599. The majority finds this case to be analogous to the termination of parental rights because the end result of the guardianship will be Aiden's death. Even if the analogy were accurate, the majority fails to state how the procedure provided for under R.C. Chapter 2111 is not fundamentally fair. In any event, the analogy is immaterial and confuses the issue. The probate court is not deciding whether

Aiden should be permanently removed from his parents. This is not a custody case. It should not be treated as one.

{¶ 93} The probate court's appointment of a medical guardian is authorized under R.C. Chapter 2111. R.C. 2111.50(F) authorizes the court and guardian to withdraw life support. R.C. Chapters 2133 and 2151 are not implicated. They do not control or even inform this decision. Because the probate court acted within its statutory authority when appointing the limited guardian, I vote to affirm its decision and that of the court of appeals.

_____

E.P. Markovich Co., L.P.A., and Edward P. Markovich, for appellants.

Brouse McDowell, Linda B. Kersker, Jay E. Krasovec, and Clair E. Dickinson, for appellee Ellen Kaforey, guardian.

David Kitzler, for appellee Richland County Children Services Board.

_____