D.K., Movant

v.

COMMONWEALTH of Kentucky, Through the CABINET FOR HEALTH AND FAMILY SERVICES; et al, Respondents.

No. 2007–CA–000537–I.

Court of Appeals of Kentucky.

March 26, 2007.

Leia Allen Knee, Bowling Green, KY, for movant D.K.

Mona S. Womack, Frankfort, KY, for the Cabinet for Health and Family Services.

Leslie Bucklew, Special Assistant Attorney General, Bowling Green, KY, for the Commonwealth.

Before COMBS, Chief Judge; MOORE, Judge; HENRY,[1] Senior Judge.

## OPINION AND ORDER

COMBS, Chief Judge.

D.K. has brought this motion under Kentucky Rule of Civil Procedure (CR) 65.07 seeking to set aside the order of the Warren Family Court permitting the Commonwealth to terminate life sustaining treatment for her son, Daniel. Daniel, approximately three and one-half years of age, is currently committed to the custody of the Cabinet and is a patient at Vanderbilt University Hospital.

Prior to suffering grievous injuries, Daniel had resided in Warren County with his

---

1. Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

mother and her live-in boyfriend. Daniel's biological father has not played a significant role in Daniel's life and had not seen him for the last two years according to the Cabinet's counsel at oral argument before this Court.

Daniel was originally presented to a hospital in Warren County on February 12, 2007, with life-threatening injuries. He was transferred to Vanderbilt in Nashville, Tennessee, by air lift on that same date. Daniel's treating physician (Dr. Bradly Strohler) and the expert appointed by the Court (Dr. Vinay Puri) both testified that Daniel has been in a persistent vegetative state since February 12. His pupils do not respond to bright-light stimuli—a responsive reflex which is regarded as the most basic of brain stem activities. According to Daniel's treating physician, Daniel's respiratory movements are the only signs of brain stem function. He is capable of exchanging gases on his own but is being aided by the use of a ventilator. Daniel's body is not able to clear his airway of mucus and saliva and cannot prevent his tongue from collapsing into the airway. Without the assist of a ventilator, both his treating doctor and expert consultant believe that he will quickly die. Both physicians testified that Daniel has no chance of a meaningful recovery and that continued use of life support is not medically necessary.

## JURISDICTION

Since his mother, the movant in this emergency action, and her boyfriend were alleged to have been the perpetrators of his injuries, the Cabinet immediately sought an emergency custody order from the Warren Circuit Court (Family Division). At the threshold of our review of this matter, we must consider the issue of jurisdiction. The movant has challenged jurisdiction.

■ After our review, we are persuaded that the Family Court properly exercised jurisdiction pursuant to Kentucky Revised Statute (KRS) 610.010(1)(e). That statute grants a family court jurisdiction over any child "living or found within the county" who is determined to be dependent, neglected, or abused. The Family Court first placed Daniel in the emergency custody of the Cabinet (KRS 620.060) on February 12. Following a removal hearing, it converted its order to one granting temporary custody to the Cabinet (KRS 620.090) on February 13. After another hearing, the Family Court entered an additional order on February 16 granting the Cabinet the authority to make medical decisions concerning Daniel's medical treatment but reserving the authority to discontinue life sustaining treatment.

We conclude that the Family Court had jurisdiction over the child and that it had the additional jurisdiction to place the child in the custody of the Cabinet. The Cabinet then properly proceeded to act as medical surrogate and medical decision-maker pursuant both to the court order and KRS 605.110(1)(b). That statutory language provides as follows:

> Unless provided otherwise, when any child committed to or in the custody of the Department of Juvenile Justice or the cabinet requires medical or surgical care or treatment, the Department of Juvenile Justice or **the cabinet may provide the same or arrange for the furnishing thereof by other public or private agencies, and may give consent to the medical or surgical treatment.** (Emphasis added.)

The statute in no way circumscribes or restricts the discretion of the Cabinet to providing for medical services solely within the boundaries of Kentucky. Presumably, the General Assembly, fully aware of the

fact that Kentucky shares borders with seven sister states, consciously declined to limit the authority of the Cabinet to make medical decisions on behalf of Kentucky children needing medical care across state lines. As there is no language in the statute so restricting jurisdiction, we should imply none.

## TERMINATION OF PARENTAL RIGHTS *VERSUS* REMOVAL OF MEDICAL TREATMENT BY THE CABINET

█ As already noted, the Cabinet sought permission of the Family Court for authority to consent to medical orders of DNI (Do Not Intubate) and DNR (Do Not Resuscitate). By its order of March 9, 2007, the Family Court granted that authorization to the Cabinet.

Daniel's mother does not challenge the medical testimony concerning the child's condition. In fact, her motion acknowledges and describes Daniel's condition as a vegetative state. However, she does challenge the court order of March 9 as impermissibly usurping her outstanding, intact parental right to direct the course of medical treatment of her son.

We have no case law in Kentucky addressing this specific issue: namely, whether the Cabinet's authority to make medical decisions extends to removing life support over the objection of a parent (alleged to be perpetrator) whose parental rights have not been terminated. In an age in which the outrage of child abuse has become exponentially widespread, it is virtually unimaginable that our General Assembly has not articulated Kentucky's public policy with clear guidelines to assist the courts in making these heart-wrenching decisions. But we have neither statute nor precedent by way of case law to govern or guide us.

Consequently, we have looked to sister states who have addressed this issue. We specifically concentrate on *In re Interest of Tabatha R.*, 252 Neb. 687, 564 N.W.2d 598 (Neb., 1997), a Nebraska case upon which the Warren Family Court relied for the proposition that the Cabinet had the authority to discontinue life support as a logical and natural corollary to its authority to direct medical treatment. However, the Nebraska case also held that removal of life support, which was inevitably to result in the child's death, essentially amounted to an involuntary termination of the parental rights of the parents. Even though the record established that the severe injury to Tabatha resulted from vigorous shaking of the infant, the Nebraska court remanded the case for a formal adjudication to terminate parental rights before allowing the Cabinet to make its ultimate decision to remove life support.

The Nebraska court determined and articulated that the best interests of the child dictated "that life support be discontinued and that she not be resuscitated...." *Id.* at 691, 564 N.W.2d 598. Nonetheless, it held that the best interests of the child were secondary to the overriding and paramount right of the parents to a due process adjudication of termination.

Kentucky is asked to address many weighty and troubling issues involving serious bioethical concerns:

(1) whether parental rights override the best interests of the child;

(2) whether an adjudication terminating parental rights is a condition precedent to the Cabinet's authority to make medical decisions on behalf of a child;

(3) whether an accusation of parental abuse alone suffices to terminate parental rights or if the presumption of innocence tolls such a termination pending a trial of

the criminal case resulting in a conviction (and if so, does the time entailed in a matter-or-right appeal also serve to further toll the termination action);

(4) whether the right to administer medical care equally entails or implies the right to withhold medical treatment that is likely to result in death;

(5) whether the standard of medical evidence as to brain death is to be by "clear and convincing evidence" or by "a preponderance of the evidence";

(6) whether we can define or articulate the fine line between what is medically necessary to sustaining life as distinguished from what amounts to merely prolonging the dying process.

Because we have never addressed these most serious questions, we have no precedent other than the decisions of sister states dictating in essence that this child may not expire and rest in peace until—and if—the superior rights of a parent are formally adjudicated. Consequently, it appears that we are compelled to remand this matter to the Warren Family Court for an adjudication of termination of the parental rights of D.K.

We lament the result, but even more, we deplore the fact that we as a Commonwealth have been derelict in pondering and articulating our public policy as to the most helpless of our citizens. Perhaps Daniel's short life will have an impact far beyond his few years among us.

This order is in no way intended to reach beyond the two narrow issues which we have addressed in the majority opinion as to jurisdiction and as to the relative rights of the Cabinet *versus* the parental rights of D.K. in making medical decisions concerning Daniel. We refrain from addressing the numerous issues that may later arise if and when the Family Court

adjudicates the parental rights of D.K. The Family Court must then re-visit the issue of just what medical treatment the Cabinet is authorized to order consistent with Kentucky statutes and public policy.

For the reasons stated above, we vacate the order of the Warren Family Court and remand this case for further proceedings consistent with this opinion.

Because of the need for expedited resolution of this matter, the Court ORDERS that this order be entered on Monday, March 26, 2007.

HENRY, Judge, Concurs.

MOORE, Judge, Dissents in Part, Concurs Separately in Part.

MOORE, Judge, Dissenting in Part and Concurring in Part.

Noting that this is a difficult case and that the members of the panel have seriously labored over it in spite of very tight timelines, I respectfully dissent in part and concur separately in part.

On March 1, 2007, the Cabinet filed a motion with the family court styled "Motion For End of Life Treatment" seeking "an Order adopting the recommendations of Dr. Bradley Stohler [Daniel's treating physician] with regards to end of life treatment for Daniel...." It is imperative to note that the Cabinet, by its own policies and admissions during oral arguments, cannot authorize the cessation of life support. Counsel for the Cabinet stated in essence that pursuant to its policies, a court order is the only permissible authorization for the discontinuation of life support systems for a child in its custody. This is in accord with its Standards of Practice. Accordingly, based upon the Cabinet's policies, it is not the Cabinet that has the authority to make these decisions;[2] rather, according to the Cabinet's

**2.** Additionally, none of the statutes governing the Cabinet grant it the authority to consent

policies only a court may do so.[3]

In its March 9, 2007 order, the family court ruled that "with the child being in the Cabinet's custody, *the Cabinet properly has the authority under 605.110(1)(b) to consent to such treatment.*" (March 9, 2007 Order, Warren Family Court at pp. 10–11) (emphasis added). I wholly disagree that KRS 605.110(1)(b) encompasses the Cabinet's power to authorize cessation of life support. This statutory provision provides in relevant part that

> [u]nless provided otherwise, when any child committed to or in the custody of the Department of Juvenile Justice or the cabinet requires medical or surgical care or treatment, the Department of Juvenile Justice or the cabinet may provide the same or arrange for the furnishing thereof by other public or private agencies, and may give consent to the medical or surgical treatment ...

The family court concluded that this statutory provision covered situations for end-of-life decisions, not just affirmative acts of medical treatment. In the family court's own words,

> the Court believes "the medical or surgical care or treatment" contemplated by the statute is that which is recommended by the child's treating physician, and may include not pursuing certain available treatments. Just as the medical treatment of a child in their custody may require the Cabinet to consent to the treatment of a cough with cough syrup, that medical treatment must also include the discontinuation of use of that cough syrup when recommended by the child's doctor...."

(March 9, 2007 Warren Family Court Order p. 9).

to ceasing life support.

**3.** The Cabinet apparently presumes that the court has the authority to enter such orders.

However, the family court's analogy lacks solid reasoning. Medical treatment is logically intended for the period of time that it is required. KRS 605.110(1)(b). The term of treatment is obviously for the time while a condition exists that needs to be treated. Certainly, a doctor would not continue to give medical treatment beyond the time when a condition is cured. Accordingly, the family court's analogy is not comparing "apples to apples."

In Daniel's case, absent a miracle, stopping medical care will be irreversible and will result in his death. For Daniel, there will be no opportunity to correct any errors if an order is entered to stop life support. Nothing in KRS Chapter 620 or the remainder of the statutes address the issue at hand. Importantly, and as conceded by counsel for the Cabinet during oral argument, the Cabinet lacks unilateral authority to consent to a termination of life support. Rather, it must seek an order from a court with proper jurisdiction authorizing the withdrawal of treatment and directing medical professionals on this issue. Or, if the parent's rights are intact, according to the Cabinet, this is the parent's decision to make.

This lack of unilateral authority is evident from any vantage point upon a review of the Cabinet's Standards of Practice. The Cabinet's "End of Life" procedures include that if a parent's rights are intact (which it is undisputed in this matter that they are), it is the parent's decision to make. If the parent's whereabouts are unknown or if the parent's rights are no longer intact, the Cabinet must petition the court for an order, wherein a court order is the only permissible authorization

As discussed infra, I question this presumption.

for discontinuance of life support systems. The Cabinet's Standards of Practice do not provide that the court may grant the Cabinet the discretion to make the decision. And, this distinction is of high importance in the case at hand because this is precisely what the family court did. The family court held that pursuant to KRS 605.110(1)(b), the issuance of a DNR or DNI was simply a continuance of the Cabinet's authority for medical treatment of the child. The family court ruled that "with the child being in the Cabinet's custody, *the Cabinet properly has the authority under 605.110(1)(b) to consent to such treatment.*" (March 9, 2007 Order, Warren Family Court at pp. 10–11) (emphasis added). This determination lacks reasoning because pursuant to the Cabinet's policies, only a court of competent jurisdiction has the power to authorize a discontinuance of life support. Consequently, I believe the family court's decision that KRS 605.110(1)(b) authorizes the Cabinet to consent to the withdrawal of medical treatment that is sustaining the child's life is clearly erroneous.

Furthermore, the Cabinet's attempt at expanding the meaning of KRS 605.110(1)(b) is contrary to KRS 13A.130, providing that

(1)An administrative body shall not by internal policy, memorandum, or other form of action:

(a) Modify a statute or administrative regulation;

(b) Expand upon or limit a statute or administrative regulation; and

(c) Except as authorized by the Constitution of the United States, the Constitution of Kentucky or a statute, expand or limit a right guaranteed by the Constitution of the United States, the Constitution of Kentucky, a statute, or an administrative regulation.

(2)Any administrative body memorandum, internal policy, or other form of action violative of this section or the spirit thereof is null, void, and unenforceable.

The Cabinet's interpretation of KRS 605.110(1)(b)'s requirement of medical treatment to include the withdrawal of life support treatment is an expansion of the authority that the General Assembly granted it to medically treat children in its custody. "[T]he decision to withdraw life-supporting treatments goes beyond the scope of making medical decisions." *In re Guardianship of Stein,* 105 Ohio St.3d 30, 821 N.E.2d 1008, 1013 (2004). Accordingly, the Cabinet's expansive reading of its authority under KRS 605.110(1)(b) is in violation of KRS 13A.130.

The question of whether authority exists for a court to enter an order to stop life support for a child in the Cabinet's custody before termination of parental rights has never been presented to the courts in this Commonwealth. The State's legislators, who are responsible for articulating the public policy for the citizens who elect them, have failed to give the Court guidance on this very important issue. In fact, it is difficult to even frame it as an "issue." Rather, it is a life. It is Daniel's life, and he has rights which should be protected. Our General Assembly has declared that Daniel enjoys many fundamental rights which must be protected and preserved "including, but not limited to, the rights to adequate food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to [his] potential; and the right to educational instruction and the right to a secure, stable family...." KRS 620.010.

Daniel's rights have not been protected. Rather, they have been trampled. The family court concluded sadly that there

were reasonable grounds to believe that Daniel was an abused child.[4] If proven, Daniel will be a part of an epidemic in our Commonwealth and our Nation—an epidemic of child abuse that is a tragedy and a black mark against our society. Who was looking out for Daniel before he suffered life-threatening injuries on February 12, 2007? Who looks out for him today?

Because Daniel's rights have been trampled in the past is no excuse to allow this practice to continue into the future. Certainly, due to the intricate nature of this case and lack of any binding authority, there are complex questions to be answered. I do not doubt that the family court struggled diligently with this most difficult case as we have. Nonetheless, it seems that in the background of this matter, the Constitution is waiting to be recognized and to be reckoned with on a number of grounds.

The mother in fact has been criminally charged with inflicting injuries on Daniel. However, that does not divest either mother or child of their constitutional rights. And while it may be distasteful to those more intimately involved or the viewing public, this child-parent relationship is protected by the United States Constitution, until the family court adjudicates otherwise.

In *Santosky v. Kramer*, 455 U.S. 745, 769–70, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Court reasoned as follows:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest

in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Id.* at 753–54, 102 S.Ct. 1388. The Court continued, noting that "a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Id.* at 758–59, 102 S.Ct. 1388 (internal quotation marks and citation omitted). In fact, the Court found that "[w]hen the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759, 102 S.Ct. 1388. Thus, "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *Id.*

Therefore, a factfinding hearing is required prior to terminating parental rights and, effectively, terminating the relationship that the child has with his parent. The Supreme Court opined that "[a]t the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge." *Id.* at 760, 102 S.Ct. 1388. However, "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Id.* Accordingly, un-

---

4. Pursuant to KRS 620.090, before a temporary custody order can enter, the court must find there are reasonable grounds to believe the child is dependent, neglected or abused.

til adjudicated otherwise, Daniel's constitutional rights to a parental relationship are intact.

The Commonwealth of Kentucky also recognizes the constitutional aspect to a parent's interest in a proceeding to terminate parental rights. In *O.S. v. C.F.*, 655 S.W.2d 32 (Ky.App.1983), this Court cited the *Santosky* decision and noted: "Parental rights are so fundamentally esteemed under our system that they are accorded due process protection under the 14th Amendment to the United States Constitution, when sought to be severed at the instance of the state." *O.S.*, 655 S.W.2d at 33.

Kentucky law requires a child's constitutional right in his relationship with his parents to be protected by providing judicial hearings to the child. Our law further provides that such protections cannot be waived by any party, except the child. Specifically, the Kentucky Unified Juvenile Code provides:

> It shall ... be the policy of this Commonwealth to provide judicial procedures in which rights and interests of all parties, including the parents and victims, are recognized and all parties are assured prompt and fair hearings. *Unless otherwise provided, such protections belong to the child individually and may not be waived by any other party.*

KRS Section 600.010(2)(g) (emphasis added).

In the majority's opinion, the Court explains the family court's flawed reasoning in the case of *In re Interest of Tabatha R.*, 252 Neb. 687, 564 N.W.2d 598 (1997). Another case illustrating the family court's error is *In re Guardianship of Stein*, 105 Ohio St.3d 30, 821 N.E.2d 1008 (2004). In *Stein*, the question before the Court was whether the probate court "exceeded its statutory authority when it appointed a guardian with the power to authorize the withdrawal of all life-sustaining support and treatment for Aiden Stein, an infant." *Stein*, 821 N.E.2d at 1009. The Court noted that emergency room doctors suspected that Aiden's injuries were the result of abuse. Aiden's father was the only person taking care of Aiden on the day he sustained his injuries, but there was evidence that Aiden had possibly been previously abused, so both of his parents were suspects. *Id.* Three doctors testified "that, at best, Aiden's outcome would be a ... persistent vegetative state." *Id.* at 1010.

In *Stein*, the hospital ethics committee recommended that a guardian be appointed to make medical decisions for the infant, and the committee recommended that Aiden be removed from life support. *Id.* The committee suggested the appointment of a guardian due to the apparent conflict of interest with the parents, considering that if Aiden died following the withdrawal of life support, his father, who was suspected to have caused Aiden's injuries, would probably be charged with murder. *Id.* at 1010, 1013.

The Ohio Supreme Court, relying on United States Supreme Court precedent, noted that "[a] parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." *Id.* at 1012 (internal quotation marks and citations omitted). The probate court had determined that it could appoint a guardian to make medical decisions and that such decisions included the withdrawal of life support. However, the Ohio State Supreme Court determined "that the decision to withdraw life-supporting treatments goes beyond the scope of making medical decisions." *Id.* at 1013. The Court further noted that the rights of Ai-

den's parents had been suspended, but not terminated, and held that "[t]he right to withdraw life-supporting treatment for a child remains with the child's parents until the parents' rights are permanently terminated." *Id.* The Ohio Supreme Court then quoted a passage from *Santosky* concerning the liberty interest of parents in making decisions concerning the care and custody of their children, even when the State has taken temporary custody of the children. *Id.* (discussing *Santosky,* 455 U.S. at 753–54, 102 S.Ct. 1388). The Court held that the probate court's order permitting the removal of life support effectively terminated the parents' rights and that the probate court exceeded its authority by doing so without first terminating the parents' rights. *Id.*

*Stein* is a case quite similar to the case at hand. Like *Stein,* in the present case, the mother is accused of playing some role in the alleged abuse of her child, resulting in the child's injuries, his placement on life support, and a possible conflict of interest. Also as in Stein, the court in the present case appointed a guardian (i.e., the Cabinet), to make medical decisions for the child, and the court determined that such decisions could include the removal of life support. However, pursuant to the reasoning in Stein, the removal of the child's life support in this case would effectively terminate the mother's parental rights without first providing her a due process hearing to determine whether such rights should be terminated—rights to which both she and Daniel are entitled.

Therefore, pursuant to the cases cited supra, the decision permitting the Cabinet to direct the hospital to withdraw the child's life support without first complying with the mother's parental rights is con-

trary to the Fourteenth Amendment of the United States Constitution. Furthermore, pursuant to *Santosky,* the child has a liberty interest in his relationship with his mother and KRS 600.010(2)(g) provides that such an interest is protected by judicial procedures, and only the child may waive such protections.

While my opinion has focused primarily up to this point on the need for adjudication proceedings before parental rights may be terminated, and certainly, the cessation of life support that would result in the child's death is a termination of parental rights, this analysis does not take precedence over whether the family court has the authority to order termination of life support. Daniel is constitutionally entitled to an answer to this question.[5] No one can question Daniel's "inalienable right to life" prior to February 12, 2007. Under the documents that govern our lives at both the State and federal levels, Daniel has the right to life. Under Section 1 of Kentucky's Constitution, he is guaranteed "the right of enjoying ... [life]." Under the Declaration of Independence, he enjoys the "inalienable right to life." *See DeGrella by and through Parrent v. Elston,* 858 S.W.2d 698 (Ky.1993). Have the events of February 12 stripped him of these rights?

The majority has articulated a series of "serious bioethical concerns." My primary concern is separate and different from the majority's. I believe before the family court can make a determination of whether a child in state custody can be removed from life support, the question is whether the court has the authority to enter this order without due deference to Daniel's inalienable right to life, which I believe to

---

**5.** At the family court level, Daniel's mother did raise the issue of the court's authority to issue an end of life order.

be of paramount importance in the ultimate resolution of this case.

Another issue raised by the mother alleges that at the temporary custody hearing, the Cabinet was provided contact information for possible relative placement. In her motion before this Court, she maintains that no follow-up has been completed on these potential placements. However, at the oral argument, her attorney stated that she had been told summarily that the placements were not satisfactory but she was not provided with an explanation regarding this.

Pursuant to KRS 620.090(1) and (2), when the court considers temporary placement options, "[p]reference *shall* be given to available and qualified relatives of the child considering the wishes of the parent...." (Emphasis added). The family court's temporary custody order does not inform the Court whether there has been compliance with KRS 620.090(1) and (2). Because the term "shall" is used in regard to the preference for relative placement, it is incumbent upon the family court to comply with this statutory section. And, perhaps the family court did. Unfortunately, we do not have the full record before us, and the temporary custody order does not address this issue. Because the mother contends that the Cabinet did not comply with KRS 620.090(1) and (2) and because the Cabinet has not supplied the Court with anything to the contrary, I believe that on remand the family court should be required to clarify whether the mandatory preference has been given to relative placement.

This is a matter involving many issues of first impression but the resolution of these issues will be of lasting impression upon this Commonwealth. I acknowledge the great difficulties faced by the family court in addressing these issues, which have not been adequately addressed by the General Assembly and empathize with the plight of the family court in resolving these issues. Certainly, guidance is needed by the General Assembly, which is responsible for articulating the public policy of this Commonwealth.